JERRI BLOUNT, Plaintiff-Appellee, v. JOSEPH STROUD et al., Defendants-Appellants.

First District (2nd Division)  Nos. 1—06—2428, 1—06—2968 cons.

———

Opinion filed June 24, 2009.—Rehearing denied October 2, 2009.—Modified opinion filed October 6, 2009.

Walter Jones, Jr., Linzey D. Jones, Tiffany M. Ferguson, and Monica M. Millan, all of Pugh, Jones, Johnson & Quandt, P.C., and Jerold S. Solovy, Benjamin K. Miller, Michael T. Brody, and John C. Roberts, Jr., all of Jenner & Block LLP, both of Chicago, for appellants.

Robin B. Potter, of Robin Potter & Associates, P.C., and Martin A. Dolan, of Dolan Law Offices, P.C., both of Chicago, for appellee.

JUSTICE THEIS delivered the opinion of the court:

Following a jury trial, defendants Jovon Broadcasting and Joseph Stroud, the owner and operational manager of Jovon Broadcasting, were found liable for retaliation against plaintiff Jerri Blount, a former employee of Jovon Broadcasting. The jury awarded Blount a total of $3,082,350 in damages, which was comprised of $257,350 for back pay, $25,000 for physical and/or emotional pain and suffering, and $2,800,000 in punitive damages. The court also awarded Blount $1,182,832.10 in attorney fees and costs. On appeal, defendants contend that: (1) the trial court erred in denying their motion for judgment notwithstanding the verdict because Blount's retaliation claim was preempted by the Illinois Human Rights Act (775 ILCS

5/1—101 *et seq.* (West 2006)); (2) the trial court erred in denying their motion for judgment notwithstanding the verdict because Blount's retaliation claim was not cognizable under section 1981 of the United States Civil Rights Act of 1991 (42 U.S.C. §1981 (2000)); (3) the trial court erred in awarding Blount attorney fees; (4) the trial court erred in submitting Blount's request for punitive damages to the jury; (5) the jury's award of $2,800,000 in punitive damages is excessive; and (6) the trial court erred in denying defendants' motion for a new trial where certain evidentiary errors committed during the trial unfairly prejudiced defendants and tainted the jury's verdict.

In 2007, we found that the circuit court lacked the subject matter jurisdiction to entertain Blount's retaliation claim under section 8—111(C) of the Human Rights Act (775 ILCS 5/8—111(C) (West 2006)) and reversed the jury's verdict without addressing the remaining issues raised by defendants. *Blount v. Stroud*, 376 Ill. App. 3d 935 (2007). The supreme court then reversed our decision, finding that the Human Rights Act did not present a jurisdictional bar to Blount's retaliation claim, whether it was a common law claim or a claim under section 1981 of the United States Civil Rights Act of 1991 (42 U.S.C. §1981 (2000)), because the Human Rights Act only addressed claims articulated expressly pursuant to that scheme. *Blount v. Stroud*, 232 Ill. 2d 302, 317-18 (2009). The supreme court accordingly remanded this cause to us to address defendants' remaining contentions. For the reasons that follow, we now affirm the judgment entered by the circuit court.

The record discloses the following facts and procedural history relevant to this appeal. In her complaint, as amended, Blount alleged the following. Blount, an African-American woman, was employed by Jovon Broadcasting, a Chicago-area television station, from 1993 until she was terminated in October 2000. At the time of her termination, Blount was the local programming time sales manager. Stroud, who is African-American, owned Jovon and managed all of its operations. Bonnie Fouts, a Caucasian-American woman discharged from employment at Jovon in 2000, filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the EEOC), in which she claimed that she had been the victim of racial and sexual harassment. After being given the right to sue by the EEOC, Fouts filed a civil rights lawsuit in the United States District Court against Stroud and Jovon. Blount witnessed the racial discrimination and sexual harassment of Fouts and agreed to testify on Fouts' behalf.[1] Blount claimed that she was discharged from Jovon on October 19,

---

[1]Fouts ultimately settled her case against defendant.

2000, in retaliation for the fact that she had agreed to testify on behalf of Fouts.

Blount claimed that this retaliation was actionable under both the common law tort of retaliatory discharge and section 1981 of the Civil Rights Act of 1991 (42 U.S.C. §1981 (2000)). Specifically, regarding the Civil Rights Act claim, Blount alleged that defendants harassed her, intimidated her, and terminated her employment because she agreed to "support" Fouts and to testify on her behalf in her race and sex discrimination suit. Blount alleged that these actions of defendants interfered with her "at will employment contract," and were a violation of section 1981. In her common law claim, Blount alleged that Jovon wrongfully terminated her in violation of Illinois public policy because she refused to perjure herself to protect defendants in the Fouts matter. Blount also asserted claims for defamation and intentional infliction of emotional distress against both defendants.

The circuit court ultimately conducted a jury trial of Blount's claims of retaliation, defamation, and intentional infliction of emotional distress. Because defendants do not contest the sufficiency of the evidence to support the jury's verdict in this appeal, we will merely present the evidence relevant to the issues raised.[2]

Stroud testified as an adverse witness that he and his wife, Yvonne, are the sole shareholders of Jovon, which is a small television broadcasting corporation. Jovon operates WJYS, Channel 62, in the Chicago area. WJYS broadcasts primarily religious programs, infomercials, and other advertisements. WJYS also broadcasts "community-based programs" and "local ministry programs." Stroud insisted that Jovon is a diverse workplace that is not operated on a racial basis.

However, Cathy Harden, Stroud's executive assistant, testified that there were discussions at the firm about the need to "hire more whites." Harden also described Stroud as having a bad temper. Harden, who is Caucasian, was also teased about being "white" and having "made it through" more than a week at Jovon.

Blount testified that Stroud hired her in 1993 to work as a program screener. After several years, Stroud promoted Blount to the sales department. There, Blount was responsible for selling air time to infomercial broadcasters. In addition to her salary, Blount was paid a commission on accounts she brought to the station which was based on how much air time she sold them. In May 2000, Stroud made Blount his local sales manager, which meant that at least four other sales representatives reported to her. At that time, Blount was Jovon's

---

[2]Additional facts will be set forth below as relevant to the evidentiary issues raised by defendants.

"best" salesperson, generating approximately $2 to $3 million in revenue for WJYS annually. As a result, Blount, who was a single mother of two, was earning roughly $250,000 a year.

Bonnie Fouts testified that she began working at WJYS in March of 1999. She began in the traffic department, which monitored broadcasts to make sure that the correct programming was being aired at the correct times. In January 2000, Rick Howell, who was the only other employee in the traffic department at the time, began to act in a "hostile" manner toward Fouts. He made inappropriate comments to her, calling her racial and sexual epithets such as "white girl" and "white bitch." When Fouts asked Howell to stop addressing her in that manner, Howell told her that he was her manager and that he could speak to her in any way he wished.

Fouts informed Stroud of Howell's behavior in the spring of 2000. Stroud initially offered Fouts money for her "pain and suffering and anguish." Fouts told Stroud that she did not want money; she wanted the harassment to stop. However, it did not. Fouts repeatedly spoke with Stroud, whom she characterized as a "very angry man with a bad temper," and asked him to intercede, but he did nothing. In April of 2000, Stroud moved Fouts to another department at Jovon, but the harassment did not stop. Fouts had several more discussions with Stroud about Howell's behavior. Fouts also began sending Stroud letters requesting that he do something about Howell's treatment of her, which Stroud admitted that he received. However, Stroud never discharged or disciplined Howell.

Stroud terminated Fouts' employment on August 24, 2000. Fouts felt that she was fired from a job that she "really liked" because she was being racially and sexually harassed and she reported that harassment. Fouts subsequently filed a charge of race and sex discrimination with the EEOC.

Stroud testified that on October 13, 2000, he received notice of Fouts' EEOC charge. Although Stroud believed that the charge was merely "legalese," he called a meeting of managers the same day. Only African-American managers attended the meeting. At that meeting, Blount indicated that she would be "supporting" Fouts in her charge of racial and sexual discrimination because she had witnessed Howell refer to Fouts numerous times as a "white bitch." Stroud admitted that he responded to Blount by stating that he did not understand "how a black person could side with a white person against a black person." Stroud also admitted that he stated that Fouts had placed the jobs of everyone at Jovon at risk by filing the EEOC charge. Stroud further stated that there was no place for independent opinions at his company.

Rick Howell testified that the charges levied by Fouts were "fictitious." He denied referring to Fouts as the "white bitch" and denied that Stroud said anything about a "black person siding with a white person" at the meeting. Howell maintained that Fouts was treated well by everyone at Jovon, but she "played the race card."

Blount and Stroud testified that several days after the meeting, they went for a walk together to discuss Blount's involvement in the Fouts matter. Stroud testified that during this conversation, he never told Blount to lie about what happened with Fouts. Blount testified that Stroud asked her what she was "going to say in regards to Bonnie [Fouts]," and she responded that she would not lie. Stroud responded that he did not "get it," and called her an "ignorant nigger." Stroud also told her that she should not "side with" Fouts because "white people" have "done nothing for her," and because she should do what he told her to do.

Stroud then gave Blount a photograph of himself with President Clinton. Stroud had signed the photograph and told her that it could be her "key" to getting work at any television station she wanted because she knew the man who was "sitting there with the president" in the photograph. Stroud also told her that the photograph would make "a powerful statement." Stroud denied giving Blount this photograph, but later admitted doing so once he was shown that he had signed it and addressed it to her. Stroud explained that the picture was taken while he was on a trip to Africa with President Clinton, based on which Stroud donated several hundred thousand dollars for H.I.V. relief. Stroud added that he had been invited on the trip by Rev. Jesse Jackson. Stroud described President Clinton as a friend and stated that he was on the board of trustees of the Bill Clinton Presidential Library. Stroud gave Blount the photograph because he was proud of it and because he wanted to make Blount proud; he denied giving it to her to show that he had "friends in high places."

Blount then admonished Stroud for having witnessed the harassment of Fouts and having done nothing. Blount testified that this made Stroud "irate." According to Blount, Stroud then started screaming at her and told her that she needed to know who she was "up against," asserting that he was "one of the richest niggers in the world," and that she did not know who she was "fucking with." Stroud also stated that he could cause her "to cease to exist."

On another occasion shortly thereafter, they began to discuss the Fouts matter again, and Stroud became "belligerent and crazed." He told her again that he could cause her "not to exist." Blount became frightened of Stroud based on these comments, which she perceived as threats. Although Stroud would often yell and scream at her, Stroud

had never threatened her like this before. Blount then began to suffer "severe anxiety attacks," from which she developed an infected esophagus.

However, in his testimony, Stroud denied threatening Blount. Rather, Stroud believed that the actions by Fouts and Blount were a conspiracy to extort money from the station. Stroud explained that he had done "so much" for Blount by hiring her and training her to be a successful salesperson that he felt Blount "betrayed" him, which made him "very angry." Stroud also believed that Blount's attorney had "put her up" to taking this position against him. Stroud described the whole situation as a "conspiracy" by Blount, Fouts, and their attorneys. Stroud added that if the Federal Communications Commission learned that WJYS discriminated on the basis of race, it could lose its broadcasting license. Stroud also admitted that he knew it was illegal to fire someone in retaliation for testifying.

Six days after receiving Fouts' charge, Stroud suspended Blount's employment. Stroud explained that he made this decision because Rick Howell, who was also his nephew, told him that Blount went around Jovon telling people that the station was "hers." Stroud also said that Ted France, another salesperson, advised him that Blount had directed business to a competitor. However, Stroud admitted that he did not have proof that Blount diverted business. Stroud also believed that Blount did not have respect for him and that she was not organized. Shortly after he suspended Blount, Stroud terminated her employment. Blount never returned to work after her suspension, and Stroud never paid her any further wages. Stroud terminated her employment on November 20, 2000. Blount commenced the present action on Feburary 23, 2001.

Several months after her termination from Jovon, Blount was hired by Affiliated Media. During her first three years there, she earned between roughly $57,000 and $90,000, which was less than half what she was earning at Jovon.

Nevertheless, at least a year after Blount filed this action, Stroud offered Blount the opportunity to return to work for him as an independent contractor. Blount testified that Stroud also asked her to "forget about the lawsuit," meaning the present suit, and told her that she should come back to work for him because he "didn't want to see [her] and [her] boys fall over a cliff." Stroud also told Blount that he had paid her "so much money" and that "Bonnie didn't pay your bills" and "get you on the other side of Harlem." Stroud gave her a check for $10,000, which Stroud testified was for "future services." Blount admitted that she cashed the check, but explained that she did so because she believed she was owed the money for sales commissions

that she had not been paid prior to her termination. Blount did not return to work for Jovon.

Sometime in the latter half of 2001, after the present suit was filed, Stroud learned that Blount had been surreptitiously recording their conversations since as early as September 2000. Blount testified that she had done so because she wanted proof that Stroud had told her to perjure herself and had threatened that she would "cease to exist" if she did not.

In September 2001, Stroud sued Blount civilly for eavesdropping. Stroud testified that he did so because he wanted to "let her suffer some of the consequences that I am suffering," and because "there would be consequences for her," which may cause her to withdraw her retaliation lawsuit. Although the circuit court judge presiding over the civil eavesdropping case entered a temporary restraining order enjoining Blount from divulging the tape recordings, Blount was never found liable for eavesdropping.[3]

Stroud nevertheless believed that Blount's actions were criminal and also pursued the filing of criminal charges against Blount. Officer Michael O'Connell of the Tinley Park police department testified that Stroud and several other individuals from Jovon filed criminal complaints alleging eavesdropping. However, Officer O'Connell explained that it was the role of the Cook County State's Attorney to determine whether or not to file criminal charges against Blount, and ultimately, the State's Attorney decided not to pursue charges against Blount.

Stroud also retained former Illinois Attorney General Roland Burris in 2002 for "legal consulting services" regarding the matter. Stroud stated that he paid Burris $10,000 for his consulting services in how criminal charges could be filed against Blount. Stroud further stated that an additional $10,000 would have been paid to Burris if these efforts were "successful."

Roland Burris also testified in this trial that Stroud contacted him for advice regarding "a potential criminal matter." Stroud told Burris that he had tried to get the Tinley Park police to investigate "a possible eavesdropping incident." Stroud asked Burris to contact the Tinley Park police to determine whether charges would be filed. Burris spoke with the police chief, who advised him that this was the State's Attorney's decision. Burris then spoke with the assistant State's Attorney handling the matter, who advised him that he was still looking

---

[3]This court's review of the records of the clerk of the circuit court of Cook County discloses that the eavesdropping suit was ultimately voluntarily dismissed pursuant to agreed order subsequent to the trial in this matter.

into whether to pursue charges. Several weeks later, the assistant State's Attorney called Burris back and informed him that there were no grounds to prosecute. Burris related this information to Lonnie Radcliffe, the executive vice-president of Jovon, and advised him that if the prosecuting body decided not to pursue charges, there was nothing that Stroud or Jovon could do to pursue Blount criminally.

Following the conclusion of the evidence, the court instructed the jury on defamation, intentional infliction of emotional distress, and a single claim of retaliation predicated on both Blount's "support" for Fouts' claim as well as her refusal to commit perjury. The court also gave the jury the pattern instruction on punitive damages (Illinois Pattern Jury Instructions, Civil, No. 35.01 (2005)). Following deliberations, the jury returned a verdict in favor of Blount on her retaliation claim and in favor of defendants on the defamation and intentional infliction of emotional distress claims. The jury awarded Blount $257,350 in back pay, $25,000 for physical and/or emotional pain and suffering, and $2.8 million in punitive damages. The court subsequently awarded Blount $1,182,832.10 in attorney fees under section 1988 of the Civil Rights Act (42 U.S.C. §1988 (2000)).

Thereafter, defendants filed a posttrial motion contending, *inter alia*, that they were entitled to a judgment notwithstanding the verdict and/or remittitur because the harm to Blount was not substantial enough to warrant punitive damages, the amount of the punitive damages awarded was unreasonable, and because the verdict was the product of numerous evidentiary errors, including the admission of evidence illegally obtained via eavesdropping. The circuit court denied the motion. Defendants subsequently filed this timely appeal.

As noted, in 2007, we reversed the jury's verdict after finding that the circuit court lacked subject matter jurisdiction over Blount's retaliation claim under the Illinois Human Rights Act (775 ILCS 5/1—101 *et seq.* (West 2006)). The supreme court subsequently reversed our decision and remanded the cause to us to consider defendants' remaining contentions on appeal. *Blount v. Stroud*, 232 Ill. 2d 302 (2009).

■ Therefore, we begin by addressing defendants' second argument, in which they claim they are entitled to judgment notwithstanding the verdict because Blount's retaliation claim was not cognizable under section 1981 of the United States Civil Rights Act of 1991 (42 U.S.C. §1981 (2000)). Specifically, defendants maintain that a retaliation claim is not contemplated by section 1981 and that, therefore, the jury's verdict in favor of Blount cannot stand as a matter of law. Defendants do not contest the sufficiency of Blount's evidence to support such a claim if it is cognizable under section 1981.

Section 1981 guarantees that all people within the United States have the same right as "white citizens" in every state and territory to make and enforce contracts. 42 U.S.C. §1981 (2000); see also *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474, 163 L. Ed. 2d 1069, 1075, 126 S. Ct. 1246, 1249 (2006) (discussing section 1981). Thus, in order to state a claim under section 1981, a plaintiff must establish proof of a contractual relationship or a would-be contractual relationship. *McDonald*, 546 U.S. at 476, 163 L. Ed. 2d at 1075-76, 126 S. Ct. at 1249-50. Although at-will employees lack a fixed duration of employment, there are nevertheless contractual aspects to an at-will employment relationship, such as wages, benefits, duties, and working conditions. *Walker v. Abbott Laboratories*, 340 F.3d 471, 476-77 (7th Cir. 2003). Thus, the protections of section 1981 also apply in the context of an at-will employment relationship. *Walker*, 340 F.3d at 477. Also, despite the language of section 1981, a "white citizen" can sue under the section where she has been discriminated against in favor of a racial minority. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 286-87, 49 L. Ed. 2d 493, 504, 96 S. Ct. 2574, 2582 (1976).

However, section 1981 does not specifically mention retaliation. See 42 U.S.C. §1981 (2000). At the time defendants filed their brief in this cause, the circuits of the United States Court of Appeals were split over whether section 1981, as amended by the Civil Rights Act of 1991, provided an avenue of recourse for individuals who had suffered retaliation for advocating for the rights of those protected under section 1981. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 401 (7th Cir. 2007), citing *Foley v. University of Houston System*, 355 F.3d 333, 339 (5th Cir. 2003), *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 693 (2d Cir. 1998), *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1412-13 (11th Cir. 1998), and *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259 (8th Cir. 1996); see also *Carney v. American University*, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998) (assuming, without a discussion of the issue, that section 1981 encompasses retaliation claims); see also *Humphries*, 474 F.3d at 411 (Easterbrook, J., dissenting) (concluding that "[s]ection 1981 does not offer one opening for a claim in the nature of retaliatory discharge"); *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 961 (11th Cir. 1997) (concluding that because section 1981 is different from Title VII, the type of discrimination it proscribes must be different and holding that section 1981 does not encompass retaliation claims).

Since that time, the United States Supreme Court has definitively held that section 1981 does encompass retaliation claims filed by individuals who have tried to help others who have suffered racial discrimination. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457,

170 L. Ed. 2d 864, 877, 128 S. Ct. 1951, 1961 (2008). Thus, Blount's retaliation claim was proper under section 1981 as a matter of law.

■ Defendants' third contention is similarly resolved by *CBOCS West*. Defendants claim that the trial court erred in awarding Blount attorney fees for her retaliation claim under section 1988 of the Civil Rights Act. 42 U.S.C. §1988 (2000). Section 1988 provides the trial court with the discretion to award reasonable attorney fees to a prevailing party in a section 1981 action. 42 U.S.C. §1988 (2000). Defendants maintain that because Blount's claim was not legally cognizable under section 1981, section 1988 is not applicable. Defendants do not contest whether the amount of the fees awarded was reasonable but only the applicability of section 1988.

As noted above, Blount's claim was cognizable under section 1981. See *CBOCS West*, 553 U.S. at 457, 170 L. Ed. 2d at 877, 128 S. Ct. at 1961. Therefore, an award of fees under section 1988 was permissible here.

■ Defendants' fourth contention on appeal is that the trial court erred in submitting Blount's request for punitive damages to the jury. Defendants claim that Blount failed to adduce sufficient proof of aggravated circumstances, such as willfulness, wantonness, fraud, or malice on the part of Stroud, to justify submission of the punitive damages to the jury. Defendants cite the fact that the amount of punitive damages, roughly $2.8 million, was significantly more than the amount of compensatory damages, $25,000 for physical and emotional harm and $257,350 for back pay, as an indication that punitive damages were inappropriate here.

Punitive damages may be awarded where retaliatory discharge has been committed with fraud, actual malice, deliberate violence or oppression, or when the defendant has acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978); see also *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 415 (1990), quoting Restatement (Second) of Torts §908(2), at 464 (1979) (" 'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others' "). Thus, "willful and wanton" misconduct " ' "approaches the degree of moral blame attached to intentional harm." ' " *Loitz*, 138 Ill. 2d at 416, quoting *Bresland v. Ideal Roller & Graphics Co.*, 150 Ill. App. 3d 445, 457 (1986), quoting Restatement (Second) of Torts §886A, Comment *k*, at 342 (1979). The purpose of punitive damages is not to compensate the plaintiff but, rather, to punish the defendant and to deter others from engaging in such conduct. *Bates v. William Chevrolet/Geo, Inc.*, 337 Ill. App. 3d 151, 160 (2003).

Although the amount of punitive damages to be awarded is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is a question of law. *Kelsay*, 74 Ill. 2d at 186. We accordingly review *de novo* the trial court's decision to submit the question of punitive damages to the jury. *Gomez v. The Finishing Co.*, 369 Ill. App. 3d 711, 721 (2006).

Here, the evidence was sufficient to show that Stroud acted willfully and wantonly in retaliating against Blount. The record discloses that on numerous occasions, Stroud tried to influence Blount's decision to testify on behalf of Fouts. Stroud offered Blount money and her job back, and asked her to "forget about" this lawsuit. Stroud also asserted his wealth, power, and connections, giving Blount a picture of himself with President Clinton and telling her that she did not know who she was "fucking with." Stroud also tried to use his connections to have Blount prosecuted criminally for eavesdropping, contacting Roland Burris to attempt to make that happen. Stroud did this to make her "suffer" some of the same consequences that he had "suffered" in having to defend a lawsuit with the objective of getting her to back down. However, most significantly, Stroud threatened Blount on more than one occasion, telling her that he could cause her to "cease to exist." Blount perceived these comments as threats on her life.

The record also discloses that Stroud consciously disregarded the rights of Fouts and Blount. Despite Fouts' requests, Stroud failed to do anything regarding Howell's treatment of Fouts. When he later received her EEOC charge, he dismissed it as "legalese." Stroud also admitted that he knew it was "illegal" to fire someone in retaliation for testifying. Although Stroud testified that he terminated Blount because of allegations that she had diverted business, Stroud admitted that he had no proof that she had done so and terminated her anyway. Stroud also offered Blount money and her job back and asked her to "forget about" this lawsuit. These facts show a conscious disregard for the rights of Blount and Fouts, as well as a sense of being above the law. It was therefore proper to submit the issue of punitive damages to the jury. See, *e.g.*, *Hollowell v. Wilder Corp.*, 318 Ill. App. 3d 984, 989 (2001).

Further, Illinois follows the Restatement analysis of punitive damages. See *Loitz*, 138 Ill. 2d at 415-16. Thus, even if it could be said that the compensatory damages awarded were "a trifling amount" in comparison to the punitive damages award, it would not mean that the punitive damages award was inconsistent or inappropriate. Restatement (Second) of Torts §908, Comment *c* (1979). We therefore find no error in the submission of the punitive damages claim to the jury.

■ Defendants' fifth contention on appeal is that the amount of punitive damages awarded by the jury was excessive and should be remitted. Defendants challenge the amount of damages under the Illinois common law standard and under the federal due process standard. We will address each in turn.

The Illinois common law punitive damages inquiry is distinct from the constitutional challenge. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1147 (2004), citing *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 450, 149 L. Ed. 2d 674, 696, 121 S. Ct. 1678, 1693 (2001). Under the Illinois standard, once the court has determined as a matter of law that punitive damages can be awarded for a particular cause of action, it is for the jury to decide based on the evidence presented whether the defendant's conduct was sufficiently willful or wanton to warrant the imposition of punitive damages. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 116 (1998). The measure of punitive damages to be awarded is also a question for the jury. *Kelsay*, 74 Ill. 2d at 186.

In reviewing a jury's award of punitive damages, relevant circumstances to consider include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant. *Deal v. Byford*, 127 Ill. 2d 192, 204 (1989). However, each case must be assessed in light of the specific facts and circumstances involved, and the underlying purpose of a punitive damage award must be satisfied. *Deal*, 127 Ill. 2d at 204.

The amount of a punitive damages award will not be reversed unless it is so excessive that it must have been a result of passion, partiality, or corruption. *Franz*, 352 Ill. App. 3d at 1139. Although the purpose of punitive damages is to punish and deter wrongful conduct, juries have been charged with their determination because they depend so closely upon the jury's fact finding. *Franz*, 352 Ill. App. 3d at 1142. Because a jury's determination of the amount of punitive damages is a predominately factual issue, we will not reverse a jury's determination as to the amount of punitive damages unless it is against the manifest weight of the evidence. *Cirrincione*, 184 Ill. 2d at 116; *Franz*, 352 Ill. App. 3d at 1145.

Here, although Stroud testified that he did not operate Jovon Broadcasting on a racial basis and denied that he tried to threaten or intimidate Blount into doing as he wished, as set forth above, there was ample other evidence from which the jury could have drawn a different conclusion. Specifically, Blount, Fouts, and Stroud's executive assistant each testified that Stroud had a very bad temper and that there were racial tensions at Jovon. The record also revealed that Stroud disregarded these allegations of racism and sexism. Blount

testified that Stroud threatened her on more than one occasion and that Stroud attempted to intimidate her with his wealth, power, and connections. Blount also presented adverse testimony from Roland Burris, the Tinley Park police chief, and other employees of Jovon which evidenced how Stroud attempted to use his connections to prevent Blount from testifying that she had witnessed racial and sexual harassment of Fouts. In making its credibility determinations, the jury also had the opportunity to observe Stroud's demeanor on the witness stand. The jury could have resolved these issues of credibility against Stroud and could have found his conduct to have been egregious enough to warrant punitive damages. Recognizing that the appellate court is not in the position to reassess the credibility of witnesses (*Franz*, 352 Ill. App. 3d at 1144), we will not second-guess the jury's credibility determinations here.

Regarding the amount of the damages, although $2.8 million is significantly more than the amount of compensatory damages awarded, under the Illinois common law analysis, there is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery. *Deal*, 127 Ill. 2d at 204. Once again, the jury heard evidence of not only the racially charged atmosphere at Jovon, but also of Stroud's attitude, his attempts to use his power and connections to intimidate and threaten, and also his substantial wealth. In his trial testimony, Stroud admitted that he was a "millionaire" and that he donated $1.5 million to Roland Burris's 2002 gubernatorial campaign and "a couple of hundred thousand dollars" to President Clinton's efforts to relieve H.I.V. in Africa. The parties stipulated that Stroud's net worth was $87.5 million.

Juries have the unique ability to "articulate community values" and evaluate "the reprehensibility of a defendant's conduct for the purposes of awarding punitive damages." *Franz*, 352 Ill. App. 3d at 1144. The jury could have found the nature of Stroud's conduct to be egregious, and when factored against his substantial wealth, it could have determined that Stroud's conduct warranted $2.8 million dollars in punitive damages. This amount represents roughly 3% of Stroud's net worth, and we cannot say that this sum was the result of passion or prejudice on the part of the jury. See, *e.g.*, *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1185 (2002) (upholding punitive damage award of 10% of the defendant's net worth for a breach of fiduciary duty); *Howard v. Zack Co.*, 264 Ill. App. 3d 1012, 1028 (1994) (upholding punitive damage award of 5% of defendant's net worth in retaliatory discharge action).

■ Defendants next claim that the jury's award of $2.8 million in punitive damages was so excessive that it violated their constitutional right to due process. This analysis differs significantly from the Illinois common law analysis.

The due process clause of the fourteenth amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor because such awards serve no legitimate purpose and constitute an arbitrary deprivation of property. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 417, 155 L. Ed. 2d 585, 600, 123 S. Ct. 1513, 1519-20 (2003). Punitive damage awards generally serve the same purposes of punishment and deterrence as criminal penalties; however, they are not subject to the protections applicable to a criminal proceeding. *Campbell*, 538 U.S. at 417, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520. Instead, they are "imprecisely" determined by juries with wide discretion to choose amounts. *Campbell*, 538 U.S. at 417, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520. Further, the United States Supreme Court has expressed "concern" that juries may be basing their awards on " 'biases against big businesses, particularly those without strong local presences.' [Citation.]" *Campbell*, 538 U.S. at 417, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520.

Accordingly, the Court developed the following three guideposts to determine whether an award of punitive damages by a jury comports with due process: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and the amount of punitive damages awarded; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 134 L. Ed. 2d 809, 826, 116 S. Ct. 1589, 1598-99 (1996). We are to apply these factors using a *de novo* standard of review in order to ensure that the punitive damages award is based upon the " 'application of law, rather than a decisionmaker's caprice.' " *Cooper Industries*, 532 U.S. at 436, 149 L. Ed. 2d at 687, 121 S. Ct. at 1685, quoting *Gore*, 517 U.S. at 587, 134 L. Ed. 2d at 834, 116 S. Ct. at 1605 (Breyer, J., concurring).

The Court has explained that the first factor, the degree of reprehensibility of the defendant's conduct, is the most important. *Gore*, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1599; see also *Campbell*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521. In evaluating the reprehensibility of the defendant's conduct, the Court has instructed us to consider whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct

involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521. The existence of only one of these factors weighing in the plaintiff's favor may not be sufficient to sustain a punitive damage award, and the existence of none of these factors in the plaintiff's favor would render the award suspect. *Campbell*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521.

Here, all but one of these factors weigh in favor of the jury's verdict. Regarding the first subfactor, although the harm to Blount was primarily emotional and economic, she also suffered some physical manifestations of psychological harm, including anxiety attacks and an esophageal infection. Moreover, Stroud also threatened Blount, informing her that he could cause her to "cease to exist" and that she "didn't know who she was fucking with." Blount understood these comments to be threats of physical harm or threats on her life. Such threats of physical violence are regarded as more reprehensible than nonviolent conduct, and actual physical harm need not occur to establish reprehensibility. *Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 53 (1st Cir. 2009). These threats make the harm in this case more reprehensible than a retaliation case involving strictly emotional and economic harm. See, *e.g.*, *Daka, Inc. v. McCrae*, 839 A.2d 682, 699-700 (D.C. App. 2003).

Regarding the third subfactor, Blount was a financially vulnerable single mother of two. Stroud knew this and sought to use her position as the sole provider for her children to persuade her to not support Fouts. Stroud told her that "Bonnie didn't pay your bills," that he did, and that she should do what he said so that she and her children did not "go over a cliff" financially. Courts have recognized single mothers such as Blount to be financially vulnerable. See, *e.g.*, *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739(KMW), slip op. at 17 (S.D.N.Y. September 6, 2005).

Regarding the fourth subfactor, we may consider the defendant's conduct toward the plaintiff as well as the defendant's related conduct toward other parties. *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 480 (2006). Conduct is related if it is factually and legally similar. *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 797 (8th Cir. 2004). Here, Stroud's conduct was repeated toward Blount and Fouts. Stroud threatened Blount on multiple occasions and tried to influence her to not testify on behalf of Fouts numerous times. Further, not only did Stroud terminate Blount for her engagement in protected activity, he also terminated Fouts based on hers. Cathy Harden also testified that she was teased for be-

ing "white." Although this evidence does not necessarily rise to the level of being a "pattern" of misconduct against numerous individuals, it nevertheless weighs in favor of upholding the punitive damages award. *Cf. Williams*, 378 F.3d at 797-98 (factually similar instances of racism against the plaintiff and against numerous other employees established a pattern of misconduct).

Regarding the fifth and final subfactor, the evidence shows intentional malice on the part of Stroud. Stroud's conduct and statements show that he intended to not only threaten and intimidate Blount, but also to make her suffer. Specifically, Stroud testified at trial that he wanted to have Blount criminally charged and to sue her civilly for eavesdropping to cause her to "suffer some of the consequences" of having to defend a lawsuit. Further, Stroud repeatedly threatened Blount. Stroud's actions in giving Blount the photograph of himself with President Clinton and in contacting Roland Burris also show that he intended to use his power and influence to induce Blount to do as he wanted without regard for what had actually happened to Fouts. *See, e.g., Lowe Excavating Co.*, 225 Ill. 2d at 482-83 (finding intentional malice where the defendant union picketed the plaintiff with signs that it knew were false in order to interfere with the plaintiff's business).

In conclusion, the evidence in the record shows that Stroud's conduct was significantly reprehensible. Stroud's threats and attempts to use his wealth and power to silence Blount compound the allegations of racism and sexism underlying the case and raise it to a level of conduct warranting a significant amount of punitive damages.

Regarding the second factor of the *Gore* analysis, we are to consider the ratio between the punitive damages awarded compared with the amount of "actual harm" sustained by the plaintiff. *Lowe Excavating Co.*, 225 Ill. 2d at 483. To that end, the Supreme Court has cautioned that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," and that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425, 155 L. Ed. 2d at 606, 123 S. Ct. at 1524. However, the Court has also made clear that the constitutional limit for the amount of punitive damages that may be awarded cannot be reduced to a " 'simple mathematical formula.' " *Lowe Excavating Co.*, 225 Ill. 2d at 484, quoting *Gore*, 517 U.S. at 582, 134 L. Ed. 2d at 830-31, 116 S. Ct. at 1602.

Here, the jury awarded Blount a total of $282,350 in compensatory damages, of which $25,000 was for Blount's physical and/or emotional pain and suffering and the balance was to compensate her

for back pay.[4] When compared to the punitive damage award of $2.8 million, the ratio would be roughly 10 to 1. However, Blount was also awarded $1,182,832.10 in attorney fees and costs under section 1988 of the Civil Rights Act. 42 U.S.C. §1988 (2000).

In Illinois, our supreme court has recognized that the amount of attorney fees expended in a case may be taken into account when assessing the propriety of a punitive damage award. *Lowe Excavating Co.*, 225 Ill. 2d at 490. A wealthy defendant can mount an extremely aggressive defense, and the prospect of costly litigation can deter lawyers from representing plaintiffs in such cases. *Lowe Excavating Co.*, 225 Ill. 2d at 490, citing *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003). Therefore, the economic cost of the litigation is a relevant consideration to factor into the side of the ratio that quantifies the amount necessary to make the plaintiff whole. See *Lowe Excavating Co.*, 225 Ill. 2d at 490; *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 136 (2008). We further note that the majority of the courts across the country that have considered this issue have agreed that an award of attorney fees should be taken into account as part of the compensatory damages factor in the *Gore* analysis. See, *e.g.*, *Willow Inn, Inc. v. Public Service Mutual Insurance Co.*, 399 F.3d 224, 236-37 (3d Cir. 2005); *Continental Trend Resources, Inc. v. OXY USA, Inc.*, 101 F.3d 634, 642 (10th Cir. 1996); *Walker v. Farmers Insurance Exchange*, 153 Cal. App. 4th 965, 973 n.8, 63 Cal. Rptr. 3d 507, 512 n.8 (2007); *Girdner v. Rose*, 213 S.W.3d 438, 449 (Tex. App. 2006); but see *Laymon v. Lobby House, Inc.*, 613 F. Supp. 2d 504, 505 (D. Del. 2009) (a Title VII case, holding that attorney fees should not be considered in the ratio because they are expressly excluded from compensatory damages under section 1981a(b)). Indeed, as the Tenth Circuit pointed out, nothing in *Gore* prohibits consideration of the costs incurred by the plaintiff in bringing the legal proceedings to vindicate rights as part of the "actual harm" suffered. *Continental Trend Resources*, 101 F.3d at 642.

In their petition for rehearing, defendants nevertheless contend that attorney fees should have been counted in the punitive side of the *Gore* compensatory-punitive damage ratio. They assert that this is because the purpose of attorney fees under section 1988 is to punish defendants for wrongful conduct. We disagree.

---

[4]In their petition for rehearing, defendants assert, for the first time, that back pay is not compensatory and, therefore, should not be included in the compensatory side of the *Gore* compensatory-punitive damages ratio. As a result, defendants have forfeited the issue, and we will not consider it. 188 Ill. 2d R. 341(e); *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 345 (2005).

Contrary to defendants' assertions, section 1988 is "remedial" in nature; it is not punitive. *Williams v. City of Fairburn*, 702 F.2d 973, 976 (11th Cir. 1983). The purpose of section 1988 is to ensure effective access to the judicial process for persons with civil rights claims and to encourage litigation to enforce the provisions of the Civil Rights Act and the Constitution. *Hernandez v. Kalinowski*, 146 F.3d 196, 199 (3d Cir. 1998). In enacting section 1988, Congress recognized that attorney fees are the single largest cost of successful civil rights litigation. *Page v. Preisser*, 468 F. Supp. 399, 403 (S.D. Iowa 1979), citing S. Rep. No. 94—1011, at 3 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5908, 5912-13.

In *Willow Inn*, the United States Court of Appeals for the Third Circuit asked "what figure" to compare to the punitive damages awarded in the ratio and found statutory attorney fees and costs awarded under a Pennsylvania statute with similar goals should be included on the compensatory side of the *Gore* ratio. *Willow Inn*, 399 F.3d at 234, 237. The Pennsylvania statute in question, which addressed bad faith by insurers in dealing with insurance claims, also provided for awards of punitive damages against the insurer and separately provided for assessment of costs and attorney fees against the insurer. *Willow Inn*, 399 F.3d at 229, quoting 42 Pa. Cons. Stat. §8371. The Third Circuit stated that although it was a "stretch" to say that the insurer "inflicted" the attorney fees and costs on the insured, the purpose of the fee-shifting provision was to ensure that plaintiffs could secure counsel. *Willow Inn*, 399 F.3d at 236. The court also found that the goal of the statute was to place the insured plaintiffs in the same economic position they would have occupied had the insurer performed as promised; thus, the attorney fees and costs were additional damages. *Willow Inn*, 399 F.3d at 237. The purpose of the separate award of punitive damages, in contrast, was to punish the insurer for giving primacy to its own self-interest over the interest of the insured. *Willow Inn*, 399 F.3d at 237. The fee shifting enabled plaintiffs to "enlist" counsel to perform the function of punishing insurers via the civil system, rather than the overloaded criminal system. *Willow Inn*, 399 F.3d at 236. Thus, the court factored the award of attorney fees and costs under the statute into the compensatory side of the *Gore* ratio and upheld the amount of punitive damages awarded in the case. *Willow Inn*, 399 F.3d at 237-38.

Here, as in *Willow Inn*, the purpose of the statutory attorney fees is to enable plaintiffs to obtain counsel to not only level the economic playing field but, also, to perform the function of a private "attorney general" to enforce fundamental constitutional rights via the civil system. See *Riddell v. National Democratic Party*, 624 F.2d 539, 543

(5th Cir. 1980), citing S. Rep. No. 94—1011, at 3 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5908, 5910. Thus, as in *Willow Inn*, we find that the award of attorney fees under section 1988 should be counted on the compensatory side of the *Gore* ratio.

Nevertheless, defendants contend that our supreme court's rationale in *Lowe* was premised on the fact that the plaintiff was not able to recoup attorney fees pursuant to statute or otherwise. Defendants maintain that because the plaintiff could not be awarded attorney fees, the supreme court allowed a higher amount of punitive damages to compensate. Our review of *Lowe* reveals that the supreme court articulated no such rationale. Moreover, the Second District in the subsequent case of *Kirkpatrick* found no distinction to be made between cases in which fees could be awarded pursuant to statute or contract and cases in which fees could not be awarded. See *Kirkpatrick*, 385 Ill. App. 3d at 136. In that case, $300,000 in punitive damages were awarded, no compensatory damages were awarded, and attorney fees were awarded under the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1996)), a statute very similar in nature to the Pennsylvania bad-faith statute at issue in *Willow Inn. Kirkpatrick*, 385 Ill. App. 3d at 123, 136. Following *Lowe*, the court found that attorney fees should be included in the compensatory side of the *Gore* ratio, as in *Willow Inn*, and upheld the award of punitive damages with a ratio of just over 3.5 to 1. *Kirkpatrick*, 385 Ill. App. 3d at 136. Defendants have articulated no reason for us to depart from this rationale.

We therefore take the attorney fee award into account as part of the "actual harm" suffered by Blount. Adding the amount of the fee award to Blount's compensatory damages, the ratio is less than 2 to 1—1.8 to 1 to be exact. This is well within the permissible guideline. See, *e.g.*, *Kirkpatrick*, 385 Ill. App. 3d at 136 (taking attorney fees into account where no compensatory damages were awarded and finding a ratio of 3.5 to 1 permissible).

The final *Gore* factor is "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.' " *Campbell*, 538 U.S. at 428, 155 L. Ed. 2d at 607-08, 123 S. Ct. at 1526, quoting *Gore*, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99. On this factor, the parties analogize to criminal fines and penalties for assault and suborning perjury. Although the Supreme Court in the past directed us to consider criminal penalties, the Court has since recognized that analogy to criminal penalties has little utility when used to determine dollar amounts. *Campbell*, 538 U.S. at 428, 155 L. Ed. 2d at 607-08, 123 S. Ct. at 1526. We will therefore not consider criminal penalties. The parties do not discuss comparable

civil sanctions in their briefs. They obviously failed to recognize that *Gore* also requires consideration of comparable civil penalties. *Campbell*, 538 U.S. at 428, 155 L. Ed. 2d at 607-08, 123 S. Ct. at 1526, quoting *Gore*, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99.

The closest analog to a section 1981 retaliation claim would be a retaliation claim under Title VII. See *Williams*, 378 F.3d at 798 (analogizing a section 1981 harassment claim to a Title VII harassment claim in assessing the third *Gore* factor). The amount of damages available under Title VII is capped based on the number of employees employed by the defendant, and the highest amount available is $300,000.[5] 42 U.S.C. §1981a(b) (2000); see also *Williams*, 378 F.3d at 798. The Illinois Human Rights Act also provides a civil means of redress for retaliation. 775 ILCS 5/6—101(A) (West 2006). However, under the Illinois Human Rights Act as it existed at the time Blount filed her complaint, punitive damages were not available. See, *e.g.*, *Cummings v. Iron Hustler Corp.*, 118 Ill. App. 3d 327, 333 (1983). The fact that these other means of redressing retaliation authorize substantially lower amounts of damages seems to mitigate against the amount of Blount's punitive damages. However, the federal courts have repeatedly recognized that the fact that section 1981 does not contain such limits should not weigh against the damage award unless there is a "huge discrepancy." See, *e.g.*, *Williams*, 378 F.3d at 798; *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1045 (9th Cir. 2003). For instance, in *Williams*, the court found a $6 million punitive damage award where only $300,000 would be authorized under Title VII to warrant remittitur. *Williams*, 378 F.3d at 798-99. There is not such a "huge discrepancy" here. The amount of punitive damages awarded was roughly $2.8 million, which is less than half of what the court found to be invalid in *Williams*. *Williams*, 378 F.3d at 798-99; see also *Zhang*, 339 F.3d at 1045 (finding a $2.6 million award to not be a "huge discrepancy" from the $300,000 limit).

Further, we must also consider the amount of damages imposed in similar cases. *Campbell*, 538 U.S. at 428, 155 L. Ed. 2d at 607-08, 123 S. Ct. at 1526, quoting *Gore*, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99. Penalties in the neighborhood of the amount awarded to Blount here have been upheld for similar 1981 claims. See, *e.g.*, *Zhang*, 339 F.3d at 1045 (upholding a $2.6 million punitive damage award in a section 1981 action alleging that the plaintiff had been harassed and terminated based on his ethnicity). For these reasons, we find that the amount of punitive damages awarded to Blount here comports with due process.

---

[5]The record does not indicate how many individuals are employed by Jovon.

■ Defendants also suggest that the jury was improperly instructed on punitive damages. Specifically, they argue that the nonpattern instruction they tendered should have been given instead of the pattern instruction. However, the record discloses that defendants withdrew the instruction they offered. Therefore, they have forfeited any objection to the use of the pattern instruction. See *Lawler v. MacDuff*, 335 Ill. App. 3d 144, 149 (2002).

Defendants' final overarching contention on appeal is that the trial court erred in denying their motion for a new trial where five separate evidentiary errors committed during the trial unfairly prejudiced them and tainted the jury's verdict. We will address each claim separately.

We review a trial court's decision regarding the admissibility of evidence for abuse of discretion. *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 98 (2008). An abuse of discretion occurs only when no reasonable person would rule as the trial court did. *Aguirre*, 382 Ill. App. 3d at 98.

■ Defendants first contend that the trial court abused its discretion in permitting Blount to present evidence regarding Stroud's "assertion of his legal rights" to pursue Blount criminally and civilly for eavesdropping. Defendants claim that the admission of this evidence violated their first amendment rights to petition the government for redress and the *Noerr-Pennington* doctrine. *United Mine Workers of America v. Pennington*, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961).

In their briefs, defendants point to three particular instances where testimony adduced at trial violated the *Noerr-Pennington* doctrine and their first amendment rights. First, they point to evidence regarding defendant Stroud's civil eavesdropping suit and the temporary restraining order he sought. Defendants claim Blount improperly introduced this evidence. However, contrary to defendants' assertions, our review of the record shows that this evidence was actually presented by defendants pursuant to a stipulation between the parties. Pursuant to that stipulation, defendants' counsel read to the jury a statement that, "Mr. Stroud filed a lawsuit against Ms. Blount in the Circuit Court of Cook County, seeking to prevent further taping and any use of the recording[s] that have been made." Defendants' counsel further informed the jury that although a temporary restraining order was entered, the judge never ruled on whether the evidence was actually an eavesdropping violation. Thus, defendants cannot now complain about the admission of evidence to which they not only stipulated, but presented to the jury. Therefore, we will not consider

their arguments regarding the admission of evidence regarding the civil eavesdropping suit.

Second, defendants point to a statement made by Stroud during his examination by his own counsel in which he stated that the judge who presided over his civil eavesdropping suit told him that he should contact the authorities to bring a criminal claim. Stroud stated that the judge told him that if, in fact, Blount's claim that her life was in jeopardy were true, then it would have been legal for her to tape him. Stroud continued to state that the judge found that Blount's life had not been threatened, and entered a temporary restraining order barring dissemination of the recorded material. However, contrary to defendants' assertions, once again, this testimony was elicited by defendants' counsel. Therefore, they cannot now complain about its admission into evidence.

Third and finally, defendants take issue with Blount's presentation of testimony from Officer Michael O'Connell of the Tinley Park police department. Officer O'Connell testified that Stroud and several other individuals from Jovon filed criminal complaints alleging eavesdropping with his office. Officer O'Connell investigated the matter, prepared a report, and turned the information over to the State's Attorney to determine whether to file criminal charges. He explained that it was the State's Attorney's decision whether or not to pursue charges, and in this instance, the State's Attorney decided not to pursue charges. Defendants objected to this testimony on, *inter alia*, the grounds that it violated the *Noerr-Pennington* doctrine, and the court overruled the objection. Defendants also raised the issue in their posttrial motion. Therefore, we will consider whether the circuit court abused its discretion in allowing the testimony.

■ Among other rights, the first amendment confers the right to petition the government for redress of grievances through the courts, by lobbying government, and by other means. *Bill Johnson's Restaurants, Inc. v. National Labor Relations Board*, 461 U.S. 731, 741, 76 L. Ed. 2d 277, 288, 103 S. Ct. 2161, 2169 (1983); *King v. Levin*, 184 Ill. App. 3d 557, 559 (1989). The *Noerr-Pennington* doctrine, in essence, provides that parties who petition the government for action favorable to their position cannot be sued under the Sherman Act (15 U.S.C. §1 *et seq.* (2000)) even though their actions are motivated by anticompetitive intent. *Stahelin v. Forest Preserve District*, 376 Ill. App. 3d 765, 776 (2007). However, that petitioning must be subjectively and objectively genuine. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61, 123 L. Ed. 2d 611, 624, 113 S. Ct. 1920, 1928 (1993).

The *Noerr-Pennington* doctrine has been applied to some state-law tort claims outside the antitrust area, such as tortious interference with prospective economic advantage. *King,* 184 Ill. App. 3d at 560. However, there is a significant amount of case law across the country discussing the applicability of the doctrine to various state-law tort claims. *Myers v. Levy,* 348 Ill. App. 3d 906, 918 (2004); see also A. Wooster, Annot., *Application of Noerr-Pennington Doctrine by State Courts,* 94 A.L.R.5th 455, 469-70 (2001). Notably, the United States Supreme Court has never applied the doctrine in a case that did not involve the Sherman Act, the National Labor Relations Act, or business and economic interest disputes between competitors. See, *e.g., BE&K Construction Co. v. National Labor Relations Board,* 536 U.S. 516, 525, 153 L. Ed. 2d 499, 511, 122 S. Ct. 2390, 2396 (2002) (explaining that "These antitrust immunity principles were then extended to situations where groups 'use ... *courts* to advocate their causes and points of view respecting resolution' of their business and economic interests *vis-à-vis* their competitors' " (emphasis in original)), quoting *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511, 30 L. Ed. 2d 642, 646, 92 S. Ct. 609, 612 (1972).

Indeed, the United States Supreme Court declined to allow the doctrine to be used as a defense to defamation, holding that the first amendment's right to petition does not insulate individuals from liability for maliciously publishing falsehoods about another. *McDonald v. Smith,* 472 U.S. 479, 485, 86 L. Ed. 2d 384, 390, 105 S. Ct. 2787, 2791 (1985). The Court specifically stated, "The right to petition is guaranteed; the right to commit libel with impunity is not." *McDonald,* 472 U.S. at 485, 86 L. Ed. 2d at 390, 105 S. Ct. at 2791. In so holding, the Court noted that in a defamation claim, the defendant's intent to harm is relevant. See *McDonald,* 472 U.S. at 484, 86 L. Ed. 2d at 389-90, 105 S. Ct. at 2791. Illinois courts have followed that holding and concluded that the first amendment right to petition and the *Noerr-Pennington* doctrine do not provide a defendant with additional protection from liability for defamation. *Myers,* 348 Ill. App. 3d at 919.

Here, defendants have failed to cite any cases permitting the *Noerr-Pennington* doctrine to be used as a defense to a retaliation claim, and this court has similarly failed to find any such cases. Defendants have also failed to discuss whether the doctrine should be extended to apply in the circumstances present in this case.

We decline to extend the applicability of the *Noerr-Pennington* doctrine to provide immunity from retaliation claims. Retaliation claims, whether under section 1981 or state common law, have more in common with defamation and privacy torts than with the Sherman

Act or the National Labor Relations Act. As with defamation claims, the defendant's intent is highly relevant to the claim. The court must examine the defendant employer's rationale for terminating or adversely treating the plaintiff employee. See, *e.g.*, *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 19 (1998) (discussing the parameters of the tort of retaliatory discharge and emphasizing that an employer cannot discharge an employee where the discharge violates public policy). Put another way, an employer does not have a right to retaliate against an employee, and the petition clause should not cloak an employer with immunity to do so. See *McDonald*, 472 U.S. at 485, 86 L. Ed. 2d at 390, 105 S. Ct. at 2791. We therefore decline to extend the *Noerr-Pennington* doctrine to the present circumstances.

However, even if it could be said that the doctrine might apply to retaliation claims, we could not find that it would apply in this case. The *Noerr-Pennington* doctrine is usually raised as a defense where one party seeks to enjoin another from bringing a suit. See, *e.g.*, *BE&K Construction*, 536 U.S. at 530, 153 L. Ed. 2d at 514, 122 S. Ct. at 2398. Thus, when the party to be enjoined has had his day in court, those concerns are no longer present. *Bill Johnson's Restaurants*, 461 U.S. at 747, 76 L. Ed. 2d at 292, 103 S. Ct. at 2172. However, the doctrine may also be applied where a party contends that another party's completed lawsuit is unlawful. *BE&K Construction*, 536 U.S. at 527, 153 L. Ed. 2d at 512, 122 S. Ct. at 2397.

Here, Blount did not attempt to thwart defendants' right to seek redress in the court system or through the criminal justice system. Indeed, defendants have already had their "day in court" on their civil eavesdropping claim against Blount, and the State's Attorney decided that there were no grounds to charge Blount criminally. Further, Blount does not claim that Stroud's actions in petitioning were unlawful. Instead, Blount used evidence of Stroud's statements and actions regarding the eavesdropping claim as circumstantial evidence of Stroud's state of mind, specifically, his retaliatory animus.

In determining whether the *Noerr-Pennington* doctrine is applicable to these circumstances, we find our prior decision in *Myers* to be instructive. In *Myers*, the court found that the plaintiff's amended complaint was not directed toward the defendant's attempt to influence government decision making. *Myers*, 348 Ill. App. 3d at 918-19. Therefore, the court found that the *Noerr-Pennington* doctrine was inapplicable and that defamation principles should govern the determination of whether the plaintiff could proceed with his claim in that case. *Myers*, 348 Ill. App. 3d at 919.

Here, as in *Myers*, Blount's amended complaint was not directed at Stroud's attempts to have her charged criminally. Rather, Blount's complaint specifically alleged that Stroud's repeated attempts to have criminal charges filed against her for eavesdropping were "further evidence of his retaliatory animus." Blount did not claim that Stroud's actions were unlawful, nor did she challenge those actions. Thus, because Blount has never sought to either thwart defendants' right to petition or claim that their actions in so doing were unlawful, the *Noerr-Pennington* doctrine is inapplicable here. See, *e.g.*, *Myers*, 348 Ill. App. 3d at 919. Accordingly, we cannot say that the trial court abused its discretion in allowing Officer O'Connell's testimony.

■ The second evidentiary error cited by defendants is that the trial court abused its discretion in allowing courtroom testimony from the eavesdropping action to be used for impeachment. Specifically, defendants assert that "Judge Goldberg allowed Ms. Blount—the eavesdropper—to use the illegally obtained statements during her attempted impeachment of Mr. Stroud and during her closing argument to the jury." Defendants claim that this was a violation of Article 14 of the Illinois Criminal Code of 1963 (720 ILCS 5/14—1 *et seq.* (West 2000)), which pertains to eavesdropping. However, in neither their brief nor their petition for rehearing did defendants point to any specific evidence that was admitted at this trial that was part of the illegally recorded material, nor do defendants cite to any portions of the record to indicate when this evidence was improperly admitted.

Article 14 of the Criminal Code generally prohibits the surreptitious recording of conversations. See 720 ILCS 5/14—2 (West 2000). Section 14—5 specifically prohibits evidence obtained in violation of the eavesdropping statute from being used in any criminal or civil proceeding. 720 ILCS 5/14—5 (West 2000). However, contrary to defendants' assertions, Blount never introduced or sought to introduce the surreptitiously recorded conversations into evidence. Rather, she used testimony adduced in the civil eavesdropping action in the present trial to impeach the testimony of Stroud and others regarding their efforts to induce her not to testify on behalf of Fouts. Our review of the record reveals that this testimony did not disseminate the contents of the illegal recordings. Indeed, the reason that defendants fail to include any citations to the record where these statements were admitted is because these statements were never admitted. Although section 14—5 prohibits the use of surreptitiously recorded material from being used, it in no way prohibits the use of courtroom testimony from a civil eavesdropping action—which did not contain the surreptitiously recorded statements—from being used for impeachment in a later proceeding. See 720 ILCS 5/14—5 (West 2000); see also *People v.*

*Seehausen*, 193 Ill. App. 3d 754, 761 (1990) (holding that sworn statements independent from surreptitiously recorded material were not prohibited by section 14—5). Therefore, we cannot say that the trial court abused its discretion when it permitted Blount to use testimony from the eavesdropping suit for impeachment.[6]

Third, defendants contend that the trial court abused its discretion in admitting the videotaped depositions of Wallace Ray Davis and Robert Klenk, the president and sales manager, respectively, of the firm that hired Blount after her termination from Jovon. In those depositions, Davis and Klenk related that shortly after they hired Blount, Shawn Hill from WJYS telephoned them and told them that Jovon had "filed criminal charges" against Blount and that she had "pulled some real Shenanigans" while she was employed there. Davis also testified that he later determined that Blount was a "model" employee and that he had an unfavorable impression of the way Jovon conducted its business. Defendants claim that this testimony was prejudicial, irrelevant, and improperly bolstered Blount's testimony.[7]

Defendants fail to recall that Blount also raised a defamation claim in her complaint, which was based on these specific allegations. This testimony was therefore relevant to those claims, and the court found as much when it ruled on defendants' motion to bar the use of that testimony at trial. The court further found that the truth or falsity of the testimony was an issue of fact for the jury to decide.

---

[6]Section 14—3 also contains an exemption for recordings made by private individuals who are a party to a conversation and under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against that individual or a member of his immediate household. 720 ILCS 5/14—3(i) (West 2000). Here, where Blount believed that Stroud was threatening her life, she would arguably come within that exception. Compare *In re Marriage of Jawad*, 326 Ill. App. 3d 141, 144 (2001) (trial court admitted surreptitious recording of statement by husband threatening that wife would "not see" their daughter "at age 11" under this exemption), with *People v. Nestrock*, 316 Ill. App. 3d 1, 9 (2000) (finding that a recording made for the purpose of assisting with investigating a crime, but where there was no threat of harm to the parties who made the recording, did not come within the exemption). Indeed, as set forth in our discussion of the facts adduced at trial, the Cook County State's Attorney determined that there were no grounds to prosecute Blount criminally.

[7]In response, Blount contends that this issue cannot be reviewed because the depositions are not in the record. However, our examination of the record has revealed that these items were contained in the record. Therefore, we may review the issue.

Thus, we cannot say that the trial court abused its discretion in admitting the testimony. *Cf. Popko v. Continental Casualty Co.*, 355 Ill. App. 3d 257, 266 (2005) (finding evidence of an employee's status as an "at-will" employee was not relevant to whether he had been terminated as a result of defamatory remarks).

Defendants' fourth evidentiary claim is that the trial court abused its discretion in admitting hearsay statements of Cathy Harden, Stroud's secretary, and Fouts. Defendants challenge two specific aspects of their testimony. First, defendants point to testimony by Harden that when Blount exited the meeting of African-American managers held to discuss Fouts' EEOC charge, she was crying and saying that Stroud wanted her to perjure herself and did not want her "siding" with Fouts. Second, defendants point to Fouts' testimony regarding the epithets that Howell called her, such as "the white bitch."

The admission of these two categories of statements does not entitle defendants to a new trial. Regarding at least the second category of statements, which were those related by Fouts, we cannot say that these statements were hearsay because they were not offered for the truth of the matter asserted. See, *e.g., Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 99 (1995) (explaining that the statement of witness A testifying that " 'B told me that event X occurred' " would be inadmissible if offered to prove that event X occurred but would be admissible if offered to prove that B said event X occurred).

Regarding both categories of statements, even if we could conclude that they were hearsay and improperly admitted, the law is clear that the erroneous admission of hearsay is not grounds for reversal where there was sufficient competent evidence to support the decision. *Cochrane's of Champaign, Inc. v. State Liquor Control Comm'n*, 285 Ill. App. 3d 28, 32 (1996), citing *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 94 (1992). Here, apart from Harden's and Fouts' testimony, there was substantial other testimony to establish that Stroud retaliated against Blount for her engaging in protected activity, including not only testimony from Blount, but also adverse testimony from Stroud, Roland Burris, and others. Further, defendants do not contest the sufficiency of the evidence to support Blount's retaliation claim. Therefore, there is no basis for disturbing the jury's verdict. See, *e.g., Anderson v. Alberto-Culver USA, Inc.*, 337 Ill. App. 3d 643, 668 (2003) (holding that although a report prepared by the National Transportation Safety Board had been improperly admitted into evidence, the error was harmless where there was ample other evidence in the record to support the jury's verdict as to who was flying an airplane at the time of a crash).

38

■ Defendants' last claim of evidentiary error is that the trial court abused its discretion in admitting two trial exhibits, numbers 20 and 52, which reflected sales credits of Jovon employees. However, as Blount correctly points out, these items are not contained in the record on appeal. Where, as here, the appellant has failed to present a sufficient record for review of an issue, we will presume that the trial court's decision on that issue was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984); *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 681 (2003).

For these reasons, we affirm the judgment entered by the circuit court of Cook County.

Affirmed.

CUNNINGHAM, P.J., and COLEMAN, J., concur.