THIRD DIVISION
March 2, 2016

2016 IL App (1st) 142847

| | | |
|---|---|---|
| JAMES CROWLEY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| WAYNE WATSON, Individually, and in His Capacity | ) | |
| as University President; and THE BOARD OF TRUSTEES | ) | No. 10 L 12657 |
| OF CHICAGO STATE UNIVERSITY, LEON D. | ) | |
| FINNEY, JR., RICHARD L. TOLIVER, BETSY HILL, | ) | |
| JULIE C. SAMUELS, ZALDWAYNAKA "Z" SCOTT, | ) | |
| LISA MORRISON BUTLER, and GARY L. ROZIER, | ) | |
| in Their Capacity as the Board of Trustees of Chicago State | ) | |
| University, | ) | The Honorable |
| | ) | James P. McCarthy, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Fitzgerald Smith concurred in the judgment and opinion.

## OPINION

¶ 1 After a lengthy jury trial, plaintiff James Crowley (Crowley) prevailed in his wrongful termination case stemming from an alleged violation of the Illinois State Officials and Employees Ethics Act (Ethics Act) (5 ILCS 430/1-1 *et seq.* (West 2008)). The jury awarded back pay of $480,000 and punitive damages of $2 million. The jury further found that he was entitled to be reinstated to his position at Chicago State University (CSU). Pursuant to the statute, in dealing with the compensatory damages verdict, the trial court doubled the back pay to $960,000, ordered defendants to pay attorney fees of $318,173.33, and awarded prejudgment interest in the amount of $60,000 for a total of $1,338,173.33. The trial court also ordered

defendants to either reinstate Crowley to his position or provide "front pay" in an amount to be determined after the promised appeal. Defendants declined to reinstate Crowley.

¶ 2    Defendants filed this interlocutory appeal, contending in the main that, as an attorney, Crowley was not legally qualified to bring an action for retaliatory discharge, while alternatively arguing that punitive damages were not statutorily authorized or that the trial court should have ordered a remittitur. Defendants also contend they are entitled to a new trial due to a juror's dishonest answers during *voir dire*. A number of state universities in Illinois, as *amici*, have filed a brief opposing the imposition of punitive damages in this case as a matter of law and policy.

¶ 3                                    BACKGROUND

¶ 4    We recite only those facts necessary to determine the dispositive issues in this appeal. Crowley was a licensed lawyer who had worked at several legal jobs before accepting employment at CSU on Chicago's South Side. He was initially hired as an attorney, where his duties included handling Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq*. (West 2008)) requests, but later segued into an administrative position where he managed several departments including the Follett bookstore and the Patricia and Emil Jones Convocation Center (JCC) while continuing to handle FOIA requests. Crowley's employment was without incident until 2009, when it was announced that defendant Dr. Wayne Watson was hired to become president of CSU.

¶ 5    Watson had just finished a job as the head of the Chicago City Colleges and planned to draw his state pension. Shortly after the announcement of the CSU job, it was discovered that, in order to begin receiving pension payments from the State University Retirement Systems (SURS), the rules required him to have a three-month gap between state jobs. During the gap, amidst significant public controversy about the merits of Watson's appointment, allegations arose

that focused on Watson's alleged use of state funds to renovate the so-called "presidential residence" while making decisions at CSU when he was not yet officially in office. During this period, in the view of all parties at trial, Watson was not a CSU employee and thus could not authorize any sort of activity at the university.

¶ 6      Numerous FOIA requests were received by CSU from curious citizens (including a rather prolific document requester named Phillip Beverly, a tenured political science professor at CSU) which called for, *inter alia*, any documents concerning Watson's hiring and the work at the residence. Crowley went about the task of collecting all documents that he believed would be responsive to these numerous requests.

¶ 7      Soon thereafter, Watson (who was still not yet president) asked Crowley to meet on August 13, 2009, in the president's office with himself and interim president, Dr. Sandra Westbrooks. Suffice it to say that the testimony of Crowley and Watson, the two principal protagonists at trial, was quite divergent about this meeting. When Crowley entered the president's office, he saw Watson with the pile of documents that Crowley had determined would be responsive to the FOIA requests. Crowley had not provided these documents to Watson. Crowley testified that Watson badgered him repeatedly during this hour-long meeting and suggested that only two pages (a moving company's bill) needed to be produced to satisfy the FOIA requests. Crowley, meanwhile, insisted that the entire pile of documents was going to be produced. According to Crowley, Watson demanded that nothing be produced without his personal review, despite the notable facts that Watson was not yet an employee and that it was Crowley's job to fully respond to FOIA requests. Crowley testified that a rather animated Watson grabbed his wrist and told him that "if you read this my way, you're my friend. If you do it your way, you're my enemy."

¶ 8     Watson, contrarily, testified that he merely offered the opinion that only the moving bill should be produced, which simply led to further "discussion." He emphasized that he was not directing Crowley to do anything, since he was not yet in office, and went on to note that he respectfully addressed Crowley as "counselor," while reassuring him that the disclosure decision was Crowley's to make. He specifically denied both the claimed physical contact and the content of the alleged threat. Watson also denied that he instructed Crowley to contact a friendly journalist for damage control purposes.

¶ 9     This meeting unsettled Crowley and prompted him to meet with Louis Dolce, an investigator for the Illinois Attorney General's Office to discuss the documents, as well as Watson's objection and Watson's not-so-veiled threat. Crowley alerted the investigator to documents that he believed established that there was illegal "stringing" of contracts between CSU and another contractor with ties to Watson to make it appear that each contract was under the amount which called for competitive bidding. Crowley later spoke with another Attorney General investigator, James Dorger, who testified that the allegation of stringing was meritorious based on his investigation.

¶ 10     Meanwhile, SURS denied Watson's bid for pension benefits, prompting him to file an appeal which was set for the last week in January 2010. At the end of Watson's pension hearing, it was determined that no decision would be made until the FOIA documents were produced. Crowley ultimately released all documents responsive to the FOIA request as required by law.

¶ 11     The jury heard testimony about a "scheduled audit" at CSU for the fiscal year that ended June 20, 2009. The audit was conducted by John Meehan, the chief internal auditor for the JCC, which fell under Crowley's responsibilities. Meehan found inadequate supporting documentation for certain disbursements. He also noted that some of the travel requests by Crowley should have

4

been authorized by senior management. He further noted issues with regard to parking spaces at the JCC, which were paid for by CSU, without any specific proof of who parked in those spaces. Testimony revealed that one of these spaces was used by Crowley and one by a student named Jackson. According to CSU's rules, Jackson's space was appropriately paid for by CSU since he worked for VenuWorks, a vendor that managed events at the JCC. Crowley's space, on the other hand, needed additional approval that was not documented.

¶ 12    Later, on January 28, 2010, Meehan, "at the request of senior management," began a separate investigation and unscheduled audit of the "financial and operational records" of the JCC. Meehan testified that he could not recall who in senior management made the request. His report concluded that there were shortcomings in the required "accounting policies and procedures" from the JCC. Defendants repeatedly referred to Meehan's work as a "400 page book" that had proof of "63 findings" of irregularities at the JCC attributable to Crowley.

¶ 13    To Crowley, these efforts constituted a thinly veiled effort to find pretextual bases to fire him. Crowley asserted he was terminated in retaliation for contacting the Attorney General's office and disclosing information he reasonably believed was a violation of the law, rules, or regulations and also for providing SURS with the FOIA responses. See 5 ILCS 430/15-10(1), (2) (West 2008). His one-count lawsuit[1] relied on article 15, the Whistle Blower Protection section of the Ethics Act, which prohibits retaliatory action against a state employee's involvement in protected activity, including disclosing or providing information in a particular manner. See 5 ILCS 430/15-10 (West 2008). He sued Watson individually, in his capacity as CSU president, and sued the CSU board of trustees. Crowley later conceded he sought punitive damages only against CSU. Defendants, meanwhile, suggested that there was no relationship between the

---

[1] Crowley previously filed a claim against CSU under the Illinois Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2008)), but the trial court dismissed the claim giving Crowley leave to replead in the Illinois Court of Claims.

FOIA issue and the subsequent investigation, and that Crowley was terminated because of issues raised in the investigation itself (*i.e.*, improper financial dealings and misuse of university resources).

¶ 14    Nothing in Meehan's investigation addressed any of Crowley's responsibilities as an attorney for CSU. Instead, the inquiry focused solely on his administrative work with respect to the JCC. In sum, defendants claimed that the investigation showed various transgressions by Crowley, including the inappropriate use of university funds to pay for parking spaces for himself and some associates. Defendants also claimed that he conspired to award a "Follett Scholarship" to the student/employee Jackson who was also "comped" for travel and lodging at a conference in Hawaii.

¶ 15    Jackson, in fact, seemed to be at the center of CSU's grievances which apparently led to Crowley's firing. Before trial began, during the court's rulings on Crowley's motions *in limine*, defense counsel made it clear that defendants' theory of the case involved Crowley's "preferential treatment" of Jackson and alleged that the two of them had an inappropriate relationship. The trial court allowed defendants to prove the existence of the relationship, but defendants failed to offer any competent evidence at trial. At the same time, the evidence at trial revealed that Jackson never received the scholarship and that the Hawaii trip was canceled due to budget restrictions. Jackson remained in the employ of the JCC contractor and was later hired by CSU.

¶ 16    On February 1, 2010, Crowley was escorted off CSU premises after being summarily suspended by Patrick Cage, CSU's newly hired (November 2009) general counsel and a longtime colleague of Watson's. Crowley was brought back to CSU on February 19, 2010, for a very brief meeting with Cage in which he was told that there were financial irregularities. Hours later, Crowley's employment was officially terminated. There is no indication in the record that

Crowley was given any opportunity to correct these perceived shortcomings, which Crowley claimed was in violation of CSU's policies and procedures.

¶ 17    As mentioned above, following evidence on the complaint, the jury found in Crowley's favor and awarded substantial damages and the trial judge also made certain compensatory awards pursuant to the statute.

¶ 18                                    *Juror Disqualification Issue*

¶ 19    Prior to the time that the parties gave their closing arguments, they agreed to a verdict being rendered by the 12 selected jurors along with 2 alternates, in an unusual gesture of gratitude. These 14 jurors required only 30 minutes to reach their verdict. After the verdict but before the posttrial motion was denied, the court heard testimony from the jury foreperson, Antoine Bass, regarding defendants' claim that their investigation revealed that he was less than completely forthcoming during *voir dire*.

¶ 20    When examined during *voir dire*, Bass indicated that he had been a high school district board member for approximately seven months and that he had been involved in termination proceedings with a south suburban school board. When asked by the court if any of the potential jurors had been involved in lawsuits, Bass acknowledged that he had been personally involved in a lawsuit in connection with his business as an appraiser. He failed to mention that he was sued as a member of the District 227 School Board in a lawsuit brought by the former superintendent of that district. Both parties questioned Bass and accepted him as a juror.

¶ 21    Defendants later informed the court that, after trial, they learned of the aforementioned school board lawsuit as well as another action in which Bass had filed a criminal complaint against a fellow school board member for assault. Defendants also discovered that Bass had filed for bankruptcy several years before he was selected as a juror.

7

¶ 22    A hearing was held to determine whether Bass's involvement in the undisclosed litigation impacted his ability to serve as an unbiased juror during trial. When questioned, Bass indicated he did not consider himself a defendant in the school board action because the board itself was the entity being sued. He told the court that he was not personally served with the suit and that he had been told that he would not be personally liable. He testified that he was unaware that the named plaintiff in that lawsuit was the daughter-in-law of a former CSU trustee.

¶ 23                                    *Posttrial Motion*

¶ 24    After trial, defendants moved for a judgment notwithstanding the jury's verdict (judgment n.o.v.), made a motion for a new trial and asked for remittitur of the jury's punitive damage verdict. Defendants claimed that they were entitled to a judgment n.o.v. because the Ethics Act does not denominate punitive damages as "one of the remedies for a violation of the Act." They alternatively argued that there was no proof of malice that would support an award of punitive damages and that the amount awarded should have been remitted by the trial court. In addition, defendants claimed that Crowley's lawsuit should have been dismissed because retaliatory discharge actions by in-house counsel are not allowed at common law and should not be allowed under the Ethics Act.

¶ 25    Defendants also claimed that they were entitled to a new trial because of the juror's failure to completely answer questions about his litigation history and because of various errors committed by the trial court related to the admission of various items of evidence.

¶ 26    In a lengthy written order, the trial court denied defendants' posttrial motion. This timely appeal followed.

¶ 27                                    ANALYSIS

8

¶ 28    A motion for judgment n.o.v. should only be granted when the evidence and inferences, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Thornton v. Garcini*, 237 Ill. 2d 100, 107 (2009). We review *de novo* a trial court's ruling on a motion for judgment n.o.v. *Id.*

¶ 29    By contrast, the standard for determining whether a trial court erred in denying a motion for a new trial is whether the jury's verdict was against the manifest weight of the evidence, *i.e.*, where the opposite conclusion is readily apparent or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). We generally give a trial court's decision to deny a motion for a new trial great deference and, as such, it will only be reversed when there is a clear abuse of discretion. *Id.* at 455; *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 548 (1981). Keeping these standards in mind, we proceed in our review.

¶ 30                          *Retaliatory Discharge*

¶ 31    Section 15-10 of the Ethics Act, in relevant part, prohibits "a State employee" or "a State agency," which includes CSU, from retaliating against another state employee for protected activity. 5 ILCS 430/15-10 (West 2008); see also 5 ILCS 430/1-5, 15-5 (West Supp. 2009); 110 ILCS 220/2 (West 2008). Protected activity encompasses disclosing to "a public body an activity, policy, or practice of any *** State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation." 5 ILCS 430/15-10 (West 2008). It also encompasses providing information to a "public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by any *** State agency, or other State employee." *Id.* A "public body," for example, would include the Attorney General's office, as well as its employees, and SURS. 5 ILCS 430/15-5 (West Supp. 2009); see

9

also 5 ILCS 430/1-5 (West Supp. 2009). A violation of article 15 of the Ethics Act occurs where a state employee engages in protected activity, and establishes that such conduct "was a contributing factor in the retaliatory action alleged by the State employee." 5 ILCS 430/15-20 (West 2008).

¶ 32    Here, Crowley asserted he was discharged in retaliation for contacting the Attorney General's office and disclosing information he reasonably believed was a violation of the law, rules, or regulations and also for providing SURS with the FOIA responses. See 5 ILCS 430/15-10(1), (2) (West 2008). This claim is analogous to the tort of retaliatory discharge, a narrow exception to Illinois's general rule of at-will employment that was first recognized in the seminal case, *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978). A cause of action for retaliatory discharge similarly involves discharge in retaliation for protected activities, in violation of a clear public policy mandate. *Zimmerman v. Buchheit of Sparta, Inc.,* 164 Ill. 2d 29, 35 (1994); *Hinthorn v. Roland's of Bloomington, Inc.,* 119 Ill. 2d 526, 529 (1988).

¶ 33    Observing the paucity of case law on article 15 of the Ethics Act, defendants first contend Crowley's retaliation claim under the Ethics Act is barred by common law principles relating to the tort of retaliatory discharge. Defendants specifically argue the Ethics Act cannot be read to allow lawsuits by in-house counsel which are thus violative of *Balla v. Gambro, Inc.*, 145 Ill. 2d 492, 501 (1991), wherein the Illinois Supreme Court held, "generally, in-house counsel do not have a claim under the tort of retaliatory discharge" due to the nature of the tort and the attorney-client relationship. Defendants here specifically contend the "whistle-blowing" information Crowley exposed was learned in confidence as CSU's in-house counsel.

¶ 34    Crowley responds that defendants have forfeited this claimed error by failing to raise it at trial. Indeed, the trial court specifically found that defendants first raised this legal issue in their

posttrial motion.[2] See *Thornton*, 237 Ill. 2d at 106, 112 (arguments not raised until the filing of a posttrial motion are forfeited). Defendants conceded during oral argument that this issue could have been raised earlier.

¶ 35    Nonetheless, defendants counter they can challenge whether Crowley has asserted a recognized cause of action at any time. See *Adcock v. Brakegate, Ltd*., 164 Ill. 2d 54, 61 (1994). Defendants argue Crowley's statement in his third-amended complaint that he handled FOIA and contract issues in his capacity as a lawyer constitutes a judicial admission automatically barring the complaint under *Balla*. Defendants, however, do not dispute the general validity of retaliatory discharge under the Ethics Act as a cause of action, nor do they identify an element of the cause of action that is lacking. See *id*. at 61-62 (the forfeiture exception does not apply where the complaint states a recognized cause of action). Instead, defendants cite only an external factor that allegedly defeats the claim:  Crowley's employment as a lawyer. This has all the earmarks of an affirmative defense. See *Vroegh v. J&M Forklift*, 165 Ill. 2d 523, 530 (1995) (defining affirmative defense); see, *e.g.*, *Leyshon v. Diehl Controls North America, Inc.*, 407 Ill. App. 3d 1, 9 (2010). Yet, defendants make no argument on this point. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (points not argued are waived). Moreover, *Balla* makes clear that whether an individual is primarily practicing law in the context of a retaliatory discharge claim is a question of fact. Crowley's factual pleading in his complaint that he acted both as an administrator and lawyer in

---

[2] Defendants correctly note that they raised the issue of *Balla* in a footnote to their reply in support of their motion for summary judgment several weeks before trial. This mere footnote response does not necessarily help them since they must raise an objection both at trial and in posttrial proceedings. See *Thornton*, 237 Ill. 2d at 106. As discussed further in this opinion, they also appear to have abandoned the *Balla* defense at trial. Defendants also have not provided this court with a proper citation or record as to how the trial court ultimately disposed of their summary judgment motion.  See Ill. S. Ct. R. 341(h)(6) (eff. July 1, 2008); *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (it is the appellant's burden to maintain a sufficiently complete record to support a claim of error and any incompleteness in the record is resolved against the appellant). In addition, their argument in the footnote as to *Balla* is tentative at best. While in one breath they argued *Balla* barred the lawsuit, in the other they acknowledged *Balla*'s questionable applicability in light of *Balla*'s *dicta* distinguishing another case involving an actual whistle-blower statute, a matter which we also discuss later in this opinion.

no way serves as a concession that he was primarily a lawyer or that his discharge resulted from conduct he performed as a lawyer. It also merits mention that Watson, as a non-employee at the time of his threat to Crowley, cannot now attempt to claim attorney-client privilege in an effort to bar Crowley's claim. But even were we to credit defendants' contention, as defendants appear to take issue only with the sufficiency of the cause of action (not whether it exists), that argument is subject to forfeiture. See *Adcock*, 164 Ill. 2d at 61-62. Accordingly, defendants did not timely raise this claim, depriving Crowley of the opportunity to properly respond at trial. See *Leyshon*, 407 Ill. App. 3d at 9.

¶ 36    Continuing in their efforts to sidestep proper procedure, defendants cite the familiar principle that forfeiture is a limitation on the parties but not on this court and ask us to ignore the forfeiture in order to maintain a uniform body of precedent. See *Klaine v. Southern Illinois Hospital Services*,  2016 IL 118217, ¶ 41. This principle cannot salvage defendants' claim given the record before us. As discussed immediately below, defendants did not simply *forfeit* the claim but intentionally *abandoned* the *Balla* defense theory at trial. In addition, even assuming their claim was salvageable, we hold *Balla* is sufficiently distinguishable from the present case.

¶ 37    In *Balla*, the plaintiff was employed as a lawyer by a distributor of dialysis equipment that wanted to sell certain compromised dialyzers. Balla informed the company president that he would do "whatever necessary" to block the sale because the involved equipment did not comply with FDA regulations. Balla conceded that whether the dialyzer could be sold was a legal question and that he was acting as corporate counsel in advising on the devices. The court specifically held that Balla's activities inescapably involved the "practice of law" when he was working on the matters that prompted his discharge from the corporation that employed him. (Internal quotation marks omitted.) *Balla*, 145 Ill. 2d at 510. In so holding, the court expressly

analyzed Balla's position within the company, his duties, and evidence regarding whether Balla himself believed he was practicing law in relation to the suspect dialyzers. The court stated, "his discharge resulted from information he learned as general counsel, and from conduct he performed as general counsel." *Id.*

¶ 38    Defendants' strident reliance on *Balla* is legally counterintuitive since they spent absolutely none of their energies at trial in any attempt to prove that Crowley's legal work formed his primary duties at the University, that the FOIA and contract information was confidential, or that his legal work was a factor in his termination. The actual termination letter issued by defendants' general counsel specified that Crowley was being terminated from his "services as Assistant President for Auxiliary Operations."  This would not appear to be mere oversight or a technical failing on defendants' part, as the gravamen of their defense was that Crowley was fired for failing to properly carry out his duties as an administrator, and because he was a petty thief and immoral supervisor. This issue was strategically disregarded by defendants throughout the trial. Defendants clearly anchored their defense on the total irrelevance of the FOIA issues in the decision-making process involved in terminating Crowley. Defendants repeatedly argued to the jury that the termination was wholly unrelated to the FOIA issue and even went to great lengths to prove that Professor Beverly and another CSU employee were never "bothered" by the administration, despite their activities in the FOIA realm. They thus attempted to rebut Crowley's case that his conduct with respect to the FOIA documents and contracts was "a contributing factor in the retaliatory action."  See 5 ILCS 430/15-20 (West 2008).

¶ 39    Contrary to their position on appeal that they should be the beneficiary of the in-house counsel exception to retaliatory discharge liability, defendants offered proof at trial that Cage,

CSU's general counsel, was "excited" about plans for Crowley to "come back to the law department." Thus, this record reveals that defendants never sought the possible protection of this exception to retaliatory discharge liability because they repeatedly represented to the court and the jury that all decisions related to terminating Crowley stemmed from the JCC audit. In light of the fact that this jury deliberated for all of 30 minutes before returning with a verdict that thoroughly debunked defendants' rationale for Crowley's abrupt termination, any attempt by defendants to resurrect this ignored legal theory must fall on deaf ears. See *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) (" 'It is fundamental to our adversarial process that a party waives his right to complain of an error where to do so is inconsistent with the position taken by the party in an earlier court proceeding.' " (quoting *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 543 (1984)).

¶ 40      The foregoing shows that defendants not only failed to raise their present claim at trial, as required, but proposed a different theory of defense to the jury that is inconsistent with their present position, thus resulting in waiver. See *Thornton*, 237 Ill. 2d at 106, 112; *McMath*, 191 Ill. 2d at 255; see also *Cohen v. Sheahan*, 298 Ill. App. 3d 961, 964 (1998) (to better marshal the finite resources of the judiciary, the waiver rule is designed to encourage litigants to raise all complaints, defenses, or objections in the trial court for efficient resolution). As mentioned above, our analysis demonstrates that *Balla* is sufficiently distinguishable from the present case. Balla by his own admissions was primarily acting as in-house counsel to the corporation, while Crowley's principal duties related to administration. Balla's legal counsel was confidential, whereas the FOIA information in question here was not. And, unlike defendants here, Balla's employer did *not* contend that he was fired due to nonlegal aspects of his job, choosing instead to specifically base its defense on Balla's legal work.

¶ 41   Moreover, defendants have not adequately addressed the fact that this case involved the whistle-blowing portion of the Ethics Act. *Balla* specifically distinguished its holding from that of *Parker v. M&T Chemicals, Inc.*, 566 A. 2d 215 (N.J. Super. Ct. App. Div. 1989), where the New Jersey Superior Court construed the state whistle-blower act as compelling a retaliating employer to pay damages to an employee-attorney who is wrongfully discharged or mistreated for a reason that violates the law, or is fraudulent, criminal or incompatible with New Jersey public policy. This statement, although *dicta*, raises questions as to the lack of foundational merit of defendants' present claim on appeal. For all of the reasons stated, defendants' contention that *Balla* defeats the present action must fail.

¶ 42                    *Applicability of Punitive Damages in an Ethics Act Case*

¶ 43   Next, defendants claim that Crowley should not have been allowed to claim and receive an award of punitive damages for any alleged violation of the Ethics Act, as statutorily barred. Unfortunately for defendants on appeal, their counsel at trial also failed to raise an appropriate legal objection below. While counsel argued before trial that punitive damages are generally disfavored and that punitive damages should be disallowed due the lack of evidence indicating malice on defendants' part, and also argued the latter point during the jury instruction conference, counsel did not argue punitive damages are statutorily barred. Defendants could have filed a motion *in limine*, which would have required the trial court to rule on the merits of any such objection to punitive damages. Defense counsel also might have objected at the conclusion of Crowley's case before the jury. Oddly enough, Crowley's counsel almost forgot to ask the jury for punitive damages and had to ask the court to allow him to argue the issue after he had indicated to the jury that he was finished, which hypothetically provided yet another opportunity

for an objection. Defense trial counsel remained consistently mute. This specific argument was not raised until posttrial motion, and it is therefore forfeited. See *Thornton*, 237 Ill. 2d at 112.

¶ 44     Putting forfeiture aside, we find defendants' position that the statute does not permit punitive damages in an Ethics Act violation case is demonstrably incorrect. Our primary objective in construing a statute is to ascertain and effectuate the intent of the legislature, which is done by applying the plain and ordinary meaning of the statutory language. *Bowman v. Ottney*, 2015 IL 119000, ¶ 9. When construing statutory language, we view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. *Id*. In addition, a court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Id*.

¶ 45     Section 15-25 of the Ethics Act says, a "State employee may be awarded *all remedies necessary* to make the State employee whole and *to prevent future violations* of this Article." (Emphases added.) 5 ILCS 430/15-25 (West Supp. 2009). The statute also says, "Remedies imposed by the court may include, *but are not limited to*," reinstatement, double back pay, interest on back pay, the reinstatement of full fringe benefits/seniority rights, and attorney fees. (Emphasis added.) *Id*.

¶ 46     The plain language of the statute tracks the very purpose of punitive damages and provides a broad list of remedies absent limiting language, and thus permits such damages to deter further Ethics Act violations. See *Kelsay*, 74 Ill. 2d at 186 (where punitive damages may be assessed, they are allowed in the nature of punishment and also as a warning to deter like offenses in the future); see also *Vincent v. Alden-Park Strathmoor, Inc.*, 241 Ill. 2d 495, 504 (2011) (same); *cf*. Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act)

(815 ILCS 505/10a(a) (West 2008)) ("[t]he court, in its discretion may award actual economic damages or *any other relief which the court deems proper*" (emphasis added)); *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 80-82 (1994) (holding punitive damages are allowed under the Consumer Fraud Act). In that sense, we find *Maes v. Folberg*, 531 F. Supp. 2d 956 (N.D. Ill. 2007), instructive. There, the federal district court interpreted the Ethics Act to include punitive damages as a remedy, specifically stating that "the legislature envisioned the recovery of punitive damages" by the inclusion of the language regarding the prevention of future violations of the Ethics Act. *Id.* at 957; *cf. Cole v. Board ofTrustees of Northern Illinois University*, 38 F. Supp. 3d 925, 934 (N.D. Ill. 2014) (Ethics Act suits against state allowed in circuit courts, not federal courts).

¶ 47   Defendants nonetheless argue that the award of double back pay, which the statute identifies as a possible remedy, demonstrates the legislature did not intend statutory remedies to also encompass an award of punitive damages. Defendants argue such an interpretation permits a prohibited double recovery. We do not view these remedies as mutually exclusive. The legislature recognized that any one of these remedies standing alone may be insufficient to deter or punish inappropriate conduct. See 5 ILCS 430/15-25 (West Supp. 2009). As Crowley notes, a scenario could arise where back pay would be unavailable, but punitive damages might still be appropriate.

¶ 48   Similarly unavailing is defendants' position that the State of Illinois is immune from liability for punitive damages pursuant to sovereign immunity, inasmuch as the State Lawsuit Immunity Act (Immunity Act) was amended so that the state could be made a defendant in actions involving a violation of the Ethics Act. See 745 ILCS 5/1 (West 2008). This constitutes a clear and unequivocal waiver of sovereign immunity by the State for Ethics Act violations. See

*Block v. Office of the Illinois Secretary of State*, 2013 IL App (5th) 120157, ¶ 15; *In re Special Education of Walker*, 131 Ill. 2d 300, 303 (1989) (although the state has immunity, the legislature may, by statute, consent to liability of the state when "clear and unequivocal" (internal quotation marks omitted)); *Flynn v. Industrial Comm'n*, 211 Ill. 2d 546, 555 (2004) (two or more statutes which relate to the same subject, we presume, are to be read harmoniously, so that no provisions are rendered inoperative). Moreover, the Ethics Act itself provides that circuit courts maintain jurisdiction over cases brought under article 15, the Whistle Blower Protection section, and circuit courts impose the remedies in section 15-25, all of which further demonstrates waiver of sovereign immunity and the availability of punitive damages. See 5 ILCS 430/15-25 (West Supp. 2009); *Crittenden v. Cook County Comm'n on Human Rights*, 2013 IL 114876, ¶¶ 28-30 (noting under the Consumer Fraud Act, which contains similar language to the Ethics Act, punitive damages are awarded by a court and court proceedings provide additional protection to ensure punitive damages are not improperly awarded); *cf. Lynch v. Department of Transportation*, 2012 IL App (4th) 111040, ¶¶ 30-31 (ambiguity in Illinois Human Rights Act (775 ILCS 5/1-101 *et seq*. (West 2010)) as to whether State employee could sue in administrative agency or circuit court meant waiver of sovereign immunity was not clear and unequivocal). Indeed, the Ethics Act makes no distinction between individual versus state liability or the damages that ensue for a violation of the Ethics Act.

¶ 49    Given the clear language of the Ethics Act providing for remedies to deter future violations, and reading that language together with the waiver of sovereign immunity in the Immunity Act, we conclude the award of punitive damages against defendants in this case was statutorily permissible. Our interpretation of the statute, moreover, is consistent with the policy and purpose of the Ethics Act and consistent with analogous supreme court case law. In *Kelsay*,

18

74 Ill. 2d at 187, for example, the Illinois Supreme Court specifically approved the recovery of punitive damages for the related tort involving retaliatory discharge actions. The same legal sentiment surely applies with regard to state employees who are terminated for engaging in lawful conduct that protects the public. Crowley's actions here protected the public's right to know of inappropriate activities in the expenditure of state funds at a state university. Indeed, "[k]eeping government efficient and honest depends on the vigilance of those most involved in its day-to-day operations, its employees.  Those employees, however, are unlikely to step forward and speak out unless they are assured that they will not be the target of retribution by their coworkers and superiors." *Metzger v. DaRosa*, 209 Ill. 2d 30, 48-49 (2004) (Rarick, J., dissenting). In our view, it is no better to permit state resources towards allowing improper retaliation against a state employee and the defense of such impropriety than spending those resources to prevent such behavior through a punitive damages award. Accordingly, we reject defendants' argument that punitive damages were inappropriately awarded.

¶ 50                                    *Remittitur*

¶ 51     This does not end our analysis of this issue, however, as defendants alternatively argue that the trial court erroneously failed to remit the jury's award of $2 million for punitive damages. Defendants' argument consists of two parts. First, they argue that the award was grossly excessive, which we will review on a manifest weight of the evidence standard. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1144-47 (2004). The standard includes analyzing the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant. *Deal v. Byford*, 127 Ill. 2d 192, 204 (1989). Each case must be analyzed on its specific facts and so the underlying purpose of punitive damages is satisfied. *Id*. We remain mindful that it is for the jury to decide whether the defendant's conduct was

19

willful and wanton to warrant punitive damages and also the measure of punitive damages. *Blount v. Stroud*, 395 Ill. App. 3d 8, 22 (2009).

¶ 52    Second, defendants also argue that the award violates their due process rights, which we will review on a *de novo* basis. *Franz*, 352 Ill. App. 3d at 1144-47. With regard to due process, we will consider the reprehensibility of the defendant's conduct, the disparity between the harm or potential harm suffered by Crowley and the amount of punitive damages awarded, and the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 257. The reprehensibility of the conduct is the most important factor and takes into consideration the type of harm caused (physical or economic), whether the conduct shows reckless disregard for the health or safety of others, the financial vulnerability of the victim, whether the conduct was repeated or a single incident, and whether the harm resulted from malice, trickery or deceit. *Id*. ¶ 258.

¶ 53    We find that this jury's award of punitive damages was within reason and did not violate defendants' due process rights. At the outset of this analysis it is worth noting that in their appellate brief defendants make virtually no argument that Watson's actions did not rise to the level of willful and wanton conduct that could warrant the imposition of punitive damages. This is congruent with our view of the evidence, which shows that Watson and his lieutenants were nothing short of reprehensible and that they acted with malice and deceit. Defendants did whatever they could to protect Watson's reputation, and they did it at Crowley's expense, when he sought only to comply with the public's right to know information about the activities of a state university. Rather than acknowledge that Watson inappropriately got involved in university business affairs before he had officially started, CSU instigated a campaign designed to both

economically harm Crowley and to inflict psychological distress upon him. Defendants engaged in a lengthy course of manufacturing reasons, through Crowley's legitimate and previously untarnished work with the JCC, to discharge him and subsequently reported Crowley to the Attorney Registration and Disciplinary Commission (ARDC) so as to impede his future employment as a lawyer. The ARDC complaint was dismissed as lacking any basis. Likewise, there was evidence suggesting the administration's rooting out of other employee dissenters resulted in their demotion or eventual discharge, too.

¶ 54 Defendants' entirely pretextual investigation and the resulting termination letter were clearly calculated to professionally bury Crowley. At trial, counsel sought to solidify the effort to destroy Crowley's professional reputation by insinuating that he had an inappropriate relationship with Jackson. Lacking competent evidence of any such relationship, they nonetheless tried to throw some mud during cross-examination of Crowley, asking if there were "rumors" and "innuendo" regarding their relationship. This entirely improper question (stricken by the trial court) constituted the entirety of defendants' evidence on the subject. Nonetheless, on appeal defendants seek to frame their conduct admirably by arguing that Jackson was later given a job at CSU for a $55,000 salary, as if that would remove the animus that characterized their treatment of both individuals.

¶ 55 In analyzing the due process violation, the evidence thus supports a conclusion that defendants' conduct was thoroughly reprehensible. We also conclude the second factor, the ratio between the compensatory and punitive damages, was entirely reasonable. The punitive damages of $2 million were less than 1.5 times larger than the compensatory damages awarded of $1,338,173.[3] *Cf. International Union of Operating Engineers, Local 150 v. Lowe Excavating*

---

[3] Notably, Crowley also requested $240,000, representing two years' worth of front pay, should reinstatement be unavailable. Since that issue remains pending, that number does not enter into our damages analysis.

*Co.*, 225 Ill. 2d 456, 490-91 (2006) (approving punitive damages in a ratio of 11 to 1); *Holland*, 2013 IL App (5th) 110560, ¶ 260 (punitive damages of less than 5.5 times the compensatory damages' award deemed not excessive); *Blount*, 395 Ill. App. 3d at 29 (approving punitive damages in a ratio of 1.8 to 1, as "well within the permissible guideline"). Even accepting defendants' argument that doubling back pay was a punitive measure, the ratio is only about 2.4.

¶ 56    The final due process factor we must consider is the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases. As the parties note, there are no specifically comparable cases under the Ethics Act, which renders this factor of minimal value. See *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 489 (2006). The other two factors, reprehensibility of conduct and the ratio, favor Crowley's punitive damages award, and that also diminishes the impact of the third factor. See *Holland*, 2013 IL App (5th) 110560, ¶ 262. Moreover, the damages award here is in line with other retaliatory discharge tort cases involving similar malfeasance, which supports upholding it. See *Holland*, 2013 IL App (5th) 110560, ¶ 260; *Blount*, 395 Ill. App. 3d at 29-30.  Defendants' due process challenge thus fails.

¶ 57    In addition, a jury's verdict for punitive damages should be found to be excessive only if it is evident that it resulted from passion, partiality, or corruption. *Deal*, 127 Ill. 2d at 204. In reviewing the award on defendants' posttrial motion, the trial court noted that defendants' net assets exceeded $100 million and stated that defendants could survive the judgment "quite handily." As for the question of whether this award was the product of passion, we simply note two factors: Crowley's counsel's rather dispassionate argument on punitive damages was all of three minutes long and this jury's deliberations lasted no more than a half hour. We agree with the trial court's observation that "any reasonable factfinder would" find that "defendants went out

of their way to crush plaintiff." See *id*. (observing that we will not reassess the credibility of the witnesses, as that is a question for the jury); *cf. Slovinski v. Elliott*, 237 Ill. 2d 51, 64 (2010) (finding remittitur appropriate where there was no evidence presented that the defendant had an intentional, premeditated scheme to harm the plaintiff and there was no compensatory damages for loss of reputation or lost wages). The only passion revealed in this trial was the ardor with which defendants sought to humiliate their improperly terminated employee. Given the egregious conduct and trial evidence, the jury could have dispassionately found the case warranted imposition of $2 million in punitive damages. See *Blount*, 395 Ill. App. 3d at 23.

¶ 58     We thus reject defendants' contention that the future liability of CSU and other state entities under the Ethics Act is "so immense" that the punitive damages award must be precluded or limited. Our expectation, and hope, is that such ethics violations will not be a common practice opening the state up to liability. Indeed, ethics violations can be easily avoided by practicing open and honest governance. As such, the punitive damages award in this case should represent the exception rather than the rule. As the trial court noted, if this judgment is to impact taxpayers, it should encourage them to entrust the appropriate individuals with state resources and decision-making authority. Moreover, while CSU did not file a cross-claim against Watson (who was also sued here individually) in order to limit the financial burden on the university, CSU has not suggested that anything prevented it from doing so.

¶ 59     Considering that defendants forfeited the question of whether Crowley could even seek punitive damages and reflecting upon the previously enumerated evidence of willful and wanton conduct, particularly on the part of defendant Watson, we conclude that the trial court did not abuse its discretion in denying defendants' request for a remittitur of this punitive damages

verdict. See *Franz*, 352 Ill. App. 3d at 1146. Nor was the jury's decision against manifest weight of the evidence. See *id*.

¶ 60     In so holding, we also reject defendants' request to remit the double back pay that was awarded. The purpose of a back pay award is to make the employee "whole" with respect to salary, raises, sick leave, vacation pay, pension benefits, etc., absent the retaliatory act. *Clark v. Human Rights Comm'n*, 141 Ill. App. 3d 178, 182 (1986). As set forth above, punitive damages serve a different purpose of deterring violations against public policy in this state. *Midgett v. Sackett-Chicago, Inc.*, 105 Ill. 2d 143, 149-50 (1984). In our view, doubling the monetary amount of an individual's paycheck could ensure the person will be compensated with his appropriate salary and also compensated for the collateral consequences stemming from lack of income, like the inability to pay bills and fees that may accumulate as a result. Here, for instance, Crowley's loss of employment forced him to cash in his retirement and thus lose the benefit of investments. Doubling back pay could also be viewed as a punitive measure, as defendants argue. However, other than a vague statement during the jury conference that two times the "compensatories" could be punitive, defendants did not raise this specific issue until their posttrial motion. Even now, they also have not pointed to any particular evidence on damages/monetary values showing that the double back pay in reality was punitive (above and beyond compensation) or inconsistent with simply making Crowley "whole." Consequently, we reject their claim.

¶ 61     Defendants further argue Crowley is not entitled to be reinstated or to front pay because he served as in-house counsel and this remedy would violate a client's right to terminate his counsel. As discussed, the majority of Crowley's duties revolved around his role as an administrator and not as an attorney for CSU. Accordingly, we reject defendants' argument.

¶ 62                                    *Juror Disqualification*

¶ 63     The final issue raised by defendants is whether they should be granted a new trial because of the incomplete or untruthful answers provided by the juror who wound up being the foreperson of this 14-member jury. Defendants did not forfeit this issue. We review this decision of the trial court for an abuse of discretion. *Barton v. Chicago & North Western Transportation Co.*, 325 Ill. App. 3d 1005, 1026 (2001). An abuse of discretion occurs if the judge's ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view. *Id.* Our laws afford each person a fair and impartial trial, which can only be done by having the mind of each juror who sits to pass judgment upon the life, liberty or rights of another entirely free from bias or prejudice. *Lavin v. People*, 69 Ill. 303, 304 (1873). A two-prong test must be satisfied to order a new trial in this context. *Pekelder v. Edgewater Automotive Co.*, 68 Ill. 2d 136, 139 (1977). Under this test, a new trial will only be appropriate if the juror answered falsely on *voir dire* and demonstrable prejudice occurred. *Id.*

¶ 64     Defendants strenuously argue that juror Bass lied by failing to mention that he was involved in a lawsuit that stemmed from his role as a school board member. They also aver that he failed to mention that he was a party to a pending lawsuit at the time that he was selected as a juror, which they argue would have entitled them to challenge him for cause. Defendants correctly note that they are not required to show intentional dishonesty by the juror (see *Barton*, 325 Ill. App. 3d at 1026-27), which they suggest means that juror Bass's statements could be held to be unintentional and not even dishonest but still satisfy the first prong of the *Pekelder* test.

¶ 65     Even so, the real problem with defendants' argument here relates to the second prong, as they have failed to demonstrate any prejudice that occurred as a result of this juror sitting along with his 13 comrades. See *id*. at 1027-30; see also *Diaz v. Kelley*, 275 Ill. App. 3d 1058, 1064-65

(1995). In *Barton* and *Diaz*, both courts noted that the appellant failed to establish prejudice despite proof that jurors failed to disclose litigation history. *Barton* further held the facts of that case did not create a presumption of prejudice and thus cannot support defendants' present argument in that a presumption of prejudice must apply here. As in *Barton* and *Diaz*, defendants have not established any connection between Bass's litigation history and avowed impartial review of the evidence here. Bass testified he was unaware that the plaintiff in the school board lawsuit was the daughter-in-law of a former CSU trustee, and he expressly stated it formed no part of his consideration in Crowley's case. In fact, defendants have only offered evidence of mere suspicion of "bias or partiality," which does not suffice. *People v. Porter*, 111 Ill. 2d 386, 403 (1986).

¶ 66     Despite the fact that defendants were granted a hearing on this issue that included testimony by Bass, they claim that the trial court improperly denied their request for a broader hearing that would allow them to determine "what role" Bass played during the 30 minutes of deliberation, in order to determine if he exposed the other 13 jurors to "extraneous information," but this sort of hearing is inappropriate, as it pertains to the deliberative process. See *People v. Hobley*, 182 Ill. 2d 404, 463-64 (1998). Defendants' desire to delve into the motive, method or process of jury deliberations would be manifestly improper. See *People v. Nitz*, 219 Ill. 2d 400, 424 (2006). Moreover, to the extent defendants were merely intending to ask what extraneous information the jury heard without delving into its effect on the jury, which is permissible (see *id*. at 425; *Barton*, 325 Ill. App. 3d at 1029), defendants could have submitted an offer of proof with appropriate reference to the evidence they wished to present, supported by affidavits or any other such attachments. See *People v. Stevenson*, 2014 IL App (4th) 130313, ¶ 28 (an offer of proof discloses to the court and opposing counsel the nature of the offered evidence and provides

the reviewing court with a record to determine whether the trial court's action was erroneous). Defendants did not and cannot claim error now without having properly developed a record for review.

¶ 67                                          CONCLUSION

¶ 68    We affirm the judgment of the trial court in all respects and remand the matter for further proceedings consistent with this opinion.

¶ 69    Affirmed and remanded.